## A10A1873. GALINDO-ERIZA v. THE STATE.
### (701 SE2d 516)

BLACKBURN, Senior Appellate Judge.

Following a stipulated bench trial, Freddy Galindo-Eriza was convicted of trafficking in methamphetamine[1] and of obstructing law enforcement officers.[2] He appeals the denial of his motion to suppress, arguing that the police arrested him without probable cause and conducted an unlawful protective sweep of the residence, and thus their discovery of the drugs inside the residence was tainted. He further argues that without the unlawfully discovered drugs, the evidence was insufficient to support his conviction. For the reasons set forth below, we reverse the trial court's denial of Galindo-Eriza's motion to suppress and his convictions.

The standard of review of a trial court's ruling on a motion to suppress evidence is well established.

> A trial court's order on a motion to suppress will not be disturbed if there is any evidence to support it, and the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. We construe all evidence presented in favor of the trial court's findings and judgment.

(Punctuation omitted.) *Lopez v. State*.[3] See *Tate v. State*.[4] Because Galindo-Eriza intensely cross-examined the officers and challenged their credibility, we do not apply a de novo standard of review, which applies only where the facts are undisputed. *Davis v. State*.[5]

So construed, the evidence shows that in late September 2006, a Gwinnett County narcotics investigator was conducting a brief

---

[1] OCGA § 16-13-31 (e).
[2] OCGA § 16-10-24 (a).
[3] *Lopez v. State*, 292 Ga. App. 518, 519 (664 SE2d 866) (2008).
[4] *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994).
[5] *Davis v. State*, 302 Ga. App. 144, 145 (690 SE2d 464) (2010).

surveillance of a house located in Norcross, when he witnessed a suspect in one of his investigations pull into the driveway and enter the house. Based on that observation, on the night of October 13, 2006, four police officers went to that house to conduct a "knock and talk." The officers had no search warrant, nor did they have enough information at that stage to obtain one. After arriving at the residence, two of the officers approached the front door, while the other two officers positioned themselves on the driveway just off to the right side of the house. One of the officers then knocked on the door. A few moments after doing so, the officer saw someone inside the house peer through the blinds of a window next to the door and then close the blinds. When that person failed to open the door, the officer knocked again and announced that he was with the police. Following this second knock on the door, the officer again saw someone peer through the blinds, but again, that person did not answer. After knocking a third time, the officer heard people moving around inside the house, which was quickly followed by one of the other officers exclaiming that several individuals had just exited a sliding glass back door and were fleeing toward a fence that enclosed the back yard.

As four individuals attempted to flee from the back yard, the officers ordered them to stop and began pursuit. The officer who had initially alerted his colleagues that the house's occupants were fleeing used his taser to subdue one individual as that individual was climbing over the fence. Two more of the fleeing suspects were apprehended moments after escaping from the back yard. In addition, another officer stopped an occupant of the house just as that individual was crossing the threshold of the back door. In doing so, the officer could see into the house's kitchen where he observed scales, plastic containers, and what appeared to be a large quantity of methamphetamine. While securing that same individual, the officers heard a noise that sounded like a voice from inside the home. At that point, the officers conducted a protective sweep of the house and detained another suspect as he came out of one of the bedrooms.[6] During that sweep, the officers saw more suspected methamphetamine. Ultimately, all of the suspects were handcuffed and brought back to the house. Based on what the officers had observed, they

---

[6] It is unclear from the record which of the five suspects was Galindo-Eriza. The State's brief indicates that he was the individual who was still inside the home at the time the officers conducted the protective sweep. However, the State's record cite does not show that Galindo-Eriza was, in fact, this individual. Furthermore, the State's brief is at odds with the indictment, which alleges that Galindo-Eriza was one of the suspects who fled from the house. In addition, at the bench trial, Galindo-Eriza's counsel stated that his client was one of the suspects who "got out" of the house. Although it is inconsequential to our analysis, we will assume that defense counsel's and the indictment's identification of Galindo-Eriza is correct.

obtained a warrant to search the house and seized over 1,500 grams of methamphetamine.

Galindo-Eriza was indicted on one count of trafficking in methamphetamine and on one count of obstructing law enforcement officers. He filed a motion to suppress the evidence found inside the house, which the trial court denied after a hearing. His case then proceeded to a stipulated bench trial, which concluded with his conviction on both counts. Following the denial of his motion for new trial, Galindo-Eriza now appeals.

1. Galindo-Eriza contends that the trial court erred in ruling that his flight provided the police officers with reasonable articulable suspicion, which justified his detention and the subsequent discovery of the methamphetamine. He further argues that he was not merely detained but was arrested without probable cause, and thus the resulting discovery of the drugs was unlawful. We agree.

In denying Galindo-Eriza's motion to suppress the evidence found in the house, the trial court ruled that the police officers had reasonable articulable suspicion to detain the occupants who were fleeing the house and that the lawful detention of the occupant at the threshold of the back door placed the officers in a position where the methamphetamine was in plain view. The trial court is correct that "[t]he plain view doctrine authorizes a police officer to seize an illegal item if the officer is lawfully in a place where he can see the item and if he has a lawful right of access to it." (Punctuation omitted.) *Glenn v. State*.[7] "An officer gains lawful access to an item in plain view by obtaining a search warrant, obtaining consent to search, or the existence of exigent circumstances." (Punctuation omitted.) Id. Our inquiry must therefore focus on the conclusion upon which the trial court's ruling rests; that is that the police were lawfully at the house's back door. See *King v. State*[8] (police may enter the back yard of a residence under certain circumstances, such as when chasing a criminal suspect, where the front door is not easily accessible, or where no one answers the front door).

Decisions of the United States Supreme Court, including most notably *Terry v. Ohio*,[9] have set forth three tiers of police-citizen encounters: "(1) communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be sup-

---

[7] *Glenn v. State*, 285 Ga. App. 872, 874 (648 SE2d 177) (2007).
[8] *King v. State*, 289 Ga. App. 461, 464 (2) (657 SE2d 570) (2008).
[9] *Terry v. Ohio*, 392 U. S. 1, 21 (III) (88 SC 1868, 20 LE2d 889) (1968).

ported by probable cause." (Punctuation omitted.) *Minor v. State*.[10] In a first-tier encounter, "police may approach citizens, ask for identification, ask for consent to search, and otherwise freely question the citizen without any basis or belief of criminal activity so long as the police do not detain the citizen or convey the message that the citizen may not leave." (Punctuation omitted.) Id.

Here, the evidence supports a finding that the police officers' attempt to initially conduct a "knock and talk" at the Norcross residence constituted a permissible first-tier encounter. See *Herring v. State*.[11] Indeed, neither Galindo-Eriza nor the State claims that the "knock and talk" constituted anything more than a first-tier encounter. The issue requiring analysis then becomes whether the police officers' presence in the back yard so as to apprehend and detain Galindo-Eriza and the other occupants constituted a proper second-tier investigatory stop or a proper arrest.

Under *Terry v. Ohio*, a police officer, "even in the absence of probable cause, may stop persons and detain them briefly, when the officer has a particularized and objective basis for suspecting the persons are involved in criminal activity." (Punctuation omitted.) *Black v. State*.[12] In doing so,

> [t]he officer's action must be justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion, and the officer must have some basis from which the court can determine that the detention was neither arbitrary nor harassing.

(Punctuation omitted.) Id. "Detention beyond that authorized by *Terry* is an arrest, and, to be constitutional, such an arrest must be supported by probable cause." (Punctuation omitted.) *Grandberry v. State*.[13]

The State argues that when the occupants of the house exited out the back sliding glass door of the house and attempted to flee, the officers obtained reasonable articulable suspicion of criminal activity justifying an investigative stop. We disagree. Because the officers' knock and talk was admittedly a first-tier encounter, the occupants of the house, including Galindo-Eriza, were "completely free to exercise [their] right to ignore the police and leave. Indeed, a citizen's ability to walk away from or otherwise avoid a police officer is the touchstone of

---

[10] *Minor v. State*, 298 Ga. App. 391, 394 (1) (a) (680 SE2d 459) (2009).
[11] *Herring v. State*, 279 Ga. App. 162, 164 (630 SE2d 776) (2006).
[12] *Black v. State*, 281 Ga. App. 40, 43 (1) (635 SE2d 568) (2006).
[13] *Grandberry v. State*, 289 Ga. App. 534, 539 (2) (658 SE2d 161) (2008).

a first-tier encounter. Even running from police during a first-tier encounter is wholly permissible." (Citations and punctuation omitted.) *Black*, supra, 281 Ga. App. at 44 (1). See *State v. Dukes*.[14]

Furthermore, the totality of the circumstances here did not provide the officers with the reasonable articulable suspicion necessary for elevating this first-tier encounter to a second-tier *Terry* stop. There was no testimony that these occupants of the house were specifically suspected of criminal activity or that the officers even knew who they were. In fact, the totality of the circumstances here consisted of the occupants running from a house that the police had on one occasion observed a suspected drug dealer enter. However, neither the occupants' presence in the house nor their running away from the officers could provide the officers with a reasonable articulable suspicion. In *Black*, supra, 281 Ga. App. at 44-47 (1), we held that officers had no reasonable articulable suspicion to justify detaining or arresting an individual who had just left a residence that had been under surveillance for illegal drug activity. In *State v. Mallard*,[15] we held that officers had no reasonable articulable suspicion to justify stopping a vehicle that had just left a residence upon which officers were preparing to execute a search warrant for marijuana. Here, as the testifying officers acknowledged, no warrant had been issued and no search was imminent. In *State v. Harris*,[16] we found that officers had no reasonable articulable suspicion to detain a defendant based on nervousness and on defendant's cohort's exiting and then immediately returning to a motel room upon seeing police. In this matter, the mere fact that during this first-tier encounter the occupants of the house sought to "be let alone" by avoiding contact with police did not create an objective articulable suspicion. See *Black*, supra, 281 Ga. App. at 46 (1); *Harris*, supra, 261 Ga. App. at 122. Accordingly, Galindo-Eriza's and the other occupants' exercise of their right to avoid police gave the officers no grounds to detain them and conduct an investigative stop.

Moreover, even if we were to assume for the sake of argument that the officers had reasonable suspicion of illegal activity after the house's occupants fled, the officers did not conduct a brief investigative stop. Instead, they executed full-blown arrests for obstruction based solely on the occupants' flight.

> The test for determining whether a person has been placed under custodial arrest is whether the individual was for-

---

[14] *State v. Dukes*, 279 Ga. App. 247, 251 (630 SE2d 847) (2006).
[15] *State v. Mallard*, 246 Ga. App. 357, 357-358 (541 SE2d 46) (2000).
[16] *State v. Harris*, 261 Ga. App. 119, 122 (581 SE2d 736) (2003).

mally arrested or restrained to a degree associated with a formal arrest, not whether the police had probable cause to arrest. The test is whether a reasonable person in the suspect's position would have thought the detention would not be temporary. A trial court deciding whether to admit evidence must apply this objective test; it is the reasonable belief of an ordinary person under such circumstances, and not the subjective belief or intent of the officer, that determines whether an arrest has been effected.

(Punctuation omitted.) *Suluki v. State.*[17]

Here, the evidence showed that the police officers immediately pursued the fleeing suspects, using a taser to subdue one of them, and that the suspects were physically restrained and handcuffed after being apprehended. All of the suspects were then brought back to the house while the officers, who had observed the illegal drugs, obtained a search warrant. Given these circumstances, it was reasonable for all of the suspects, including Galindo-Eriza, to believe that their detention would not be temporary. See *Suluki*, supra, 302 Ga. App. at 738 (1) (reasonable for defendant placed in handcuffs to believe he was under arrest); *Minor*, supra, 298 Ga. App. at 395-396 (1) (b) (reasonable for defendant to believe he was arrested when detained and made to wait outside his home for nearly two hours while officers secured search warrant); *State v. Norris*[18] (reasonable for defendant to believe he was under arrest when told to place his hands behind his back even though he was not handcuffed).

Thus, the relevant question then becomes whether police had probable cause to arrest the fleeing occupants. OCGA § 16-10-24 (a) provides that "a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor." As previously noted, at the time the house's occupants fled from the officers, the officers were attempting to conduct a proper first-tier encounter, and thus they were lawfully discharging their official duties. However, "[the suspects'] flight from that encounter did not obstruct or hinder the officers' discharge of their *official* duties." (Emphasis in original.) *Dukes*, supra, 279 Ga. App. at 251.

A citizen may leave a first-tier encounter, and during the encounter, the officer may not detain the citizen or create the impression that the citizen may not leave. See *Black*, supra, 281 Ga.

---

[17] *Suluki v. State*, 302 Ga. App. 735, 738 (1) (691 SE2d 626) (2010).
[18] *State v. Norris*, 281 Ga. App. 193, 196 (635 SE2d 810) (2006).

App. at 43-44 (1); *Dukes*, supra, 279 Ga. App. at 251. Here,

> [s]ince [the suspects, including Galindo-Eriza] had the right to leave the encounter, [their] exercise of that right, even if accomplished by running, cannot constitute obstruction. That is to say, even though the officers were lawfully discharging their official duties at the time [the suspects] fled, those official duties during the first-tier encounter did not include detaining [the suspects] or preventing [them] from leaving. Consequently, by exercising [their] right to leave the first-tier encounter, [the suspects] did not, as a matter of law or fact, hinder or obstruct the officers' lawful discharge of their duties.

*Dukes*, supra, 279 Ga. App. at 251. See *Black*, supra, 281 Ga. App. at 44 (1). The officers therefore had no probable cause to arrest the house's occupants for obstruction by flight when their flight was from a first-tier encounter that they had every right to terminate. See *Black*, supra, 281 Ga. App. at 44 (1); *Dukes*, supra, 279 Ga. App. at 251.

Thus, because the officers entered the back yard to detain the house's occupants, including Galindo-Eriza, without the reasonable articulable suspicion necessary to justify a second-tier *Terry* stop and ultimately arrested the occupants without probable cause, the officers were not lawfully in a place where they could observe the methamphetamine in plain view. Consequently, the methamphetamine discovered as a result of those unlawful detentions and arrests must be suppressed. See *Black*, supra, 281 Ga. App. at 48 (1); *Dukes*, supra, 279 Ga. App. at 251.

2. Given our holding in Division 1 that the methamphetamine found inside the house, from which Galindo-Eriza fled, should have been suppressed, we agree with Galindo-Eriza that the State offered insufficient admissible evidence to find him guilty of trafficking in methamphetamine. See *Brown v. State*.[19] Furthermore, our holding renders Galindo-Eriza's remaining enumeration of error moot.

*Judgment reversed. Barnes, P. J., and Senior Appellate Judge William LeRoy McMurray, Jr., concur.*

DECIDED SEPTEMBER 10, 2010.

*Clark & Towne, Jessica R. Towne*, for appellant.

---

[19] *Brown v. State*, 293 Ga. App. 564, 567 (2) (a) (667 SE2d 410) (2008).

*Daniel J. Porter, District Attorney, James M. McDaniel, Assistant District Attorney*, for appellee.