**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY, P. J., and SELF, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**August 2, 2017**

# In the Court of Appeals of Georgia

A17A1288. THE STATE v. JACOBS.

DILLARD, Chief Judge.

The State appeals the trial court's grant of Kevin Jacobs's motion to suppress breath-test evidence obtained when he was arrested for, *inter alia*, driving under the influence of alcohol. On appeal, the State argues that the trial court erroneously suppressed the breath-test evidence based on a finding that the manner in which the arresting officer read the implied-consent notice would lead a reasonable person to mistakenly believe that they had no right to refuse testing. For the reasons set forth *infra*, we reverse.

The facts relevant to this appeal are undisputed.[1] On February 18, 2016, at approximately 1:30 a.m., a police officer with the DeKalb County Police Department was on patrol when he observed a vehicle approach a red light, drive past the "stopping line," and stop in the middle of a crosswalk. Based on these observations, the officer activated his emergency lights and immediately initiated a traffic stop of the vehicle. The officer first asked the driver, Jacobs, for his driver's license, and he complied. While the officer was speaking with Jacobs, he appeared to be confused, and "he had some slurred speech . . . ." The officer then asked Jacobs if he had consumed any alcoholic beverages before driving, and Jacobs responded that he had two alcoholic drinks at a nearby club.

The officer then walked back to his car to confirm that Jacobs's license was valid, and when he returned, the officer "smelled a very strong odor of cologne" that he did not smell previously. At this point, the officer also observed an open bottle of liquor in the front passenger seat of the car. When he questioned Jacobs about the bottle, Jacobs responded that he had been "drinking . . . with [his] boys." The officer

---

[1] In its appellate brief, the State adopts the trial court's recitation of the facts as set forth in its order granting Jacobs's motion to suppress, and in his response brief, Jacobs adopts the State's recitation of the facts and procedural history of the case. These undisputed facts are consistent with the evidence presented at the suppression hearing.

then asked if Jacobs would submit to any field-sobriety tests, but he refused to do so. Based on his experience, training, and observations of Jacobs, the officer believed that Jacobs "wasn't able to drive safely." The officer then asked Jacobs to exit the vehicle, and when he did so, the officer observed Jacobs swaying like he was trying to catch his balance. Thereafter, the officer took Jacobs into custody, placed him in the backseat of the patrol car, and read him the implied-consent notice for ages 21 and older. The officer asked Jacobs to "designate" whether he wanted to submit to a State-administered test of his blood, breath, urine, or other bodily substance for the purposes of determining whether he was under the influence of alcohol or drugs, and Jacobs agreed to take a breath test.

Subsequently, Jacobs was charged, via accusation, with driving under the influence per se, driving under the influence less safe, improper parking, and open container. Jacobs filed a motion to suppress the results of his breath test, arguing that his consent to the test was obtained by coercion. Following a hearing on the motion, the trial court granted it. This appeal by the State follows.[2]

---

[2] *See* OCGA § 5-7-1 (a) (4) (authorizing the State to appeal "[f]rom an order, decision, or judgment suppressing or excluding evidence illegally seized or excluding the results of any test for alcohol or drugs").

In reviewing the denial of a motion to suppress, an appellate court generally must "(1) accept a trial court's findings unless they are clearly erroneous, (2) construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court, and (3) limit its consideration of the disputed facts to those expressly found by the trial court."[3] But we review *de novo* "the trial court's application of law to the undisputed facts."[4] Thus, when, as here, the facts are undisputed,[5] we owe no deference to the trial court's legal conclusions.[6] Bearing these guiding principles in mind, we turn now to the State's specific claim of error.

In its sole enumeration of error, the State argues that the trial court erred in suppressing the results of Jacobs's breath test based on its findings that the officer failed to designate the specific test for which he was requesting consent and that the

---

[3] *Armentrout v. State*, 332 Ga. App. 370, 371-72 (772 SE2d 817) (2015) (footnotes omitted).

[4] *Id.* at 372 (punctuation omitted).

[5] *See supra* note 1.

[6] *See Hughes v. State*, 296 Ga. 744, 750 (2) (770 SE2d 636) (2015) ("Although we owe substantial deference to the way in which the trial court resolved disputed questions of material fact [not recorded on a videotape], we owe no deference at all to the trial court with respect to questions of law, and instead, we must apply the law ourselves to the material facts."); *State v. Young*, 339 Ga. App. 306, 307 (793 SE2d 186) (2016) (same).

way in which the officer read the implied-consent notice to Jacobs improperly asked him to choose one of the available chemical tests instead of asking him whether he would consent to a test in the first place. We agree.

Here, it is undisputed that before a breath test was administered to Jacobs, the arresting officer read Georgia's implied-consent statute for suspects who are 21 years old or older almost verbatim. Specifically, at the suppression hearing, the officer testified that he read the following notice to Jacobs:

> Georgia law requires you to submit to State-administered chemical tests of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs.

> If you refuse this testing, your Georgia driver's license or privilege to drive on the highways of this state will be suspended for a minimum period of one year. Your refusal to submit to the required testing may be offered into evidence against you at trial.

> If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver's license or privilege to drive on the highways of this state may be suspended for a minimum period of one year.

After first submitting to the required state tests, you are entitled to additional chemical test of your blood, breath, urine, or other bodily substances at your own expense and from qualified personnel of your own choosing.

Will you submit to the State-administered chemical test of your designated—designate which one under the Implied Consent Law?[7]

And when asked which specific test the officer asked to conduct, he testified that he allowed Jacobs the option of which test to take, and Jacobs agreed to breath test.

Based on the foregoing, the trial court found that Jacobs's consent was invalid because the way in which the officer read the question at the end of the implied-consent notice "would tend to lead a reasonable person to respond with one of the

[7] *See* OCGA § 40-5-67.1 (b) (2). We note that the last sentence of OCGA § 40-5-37.1 (b) (2) asks, "Will you submit to the state administered chemical tests of your (*designate which tests*) under the implied consent law?" And "designate which tests" is in parenthesis and underlined, suggesting that the officer reading the implied consent statute should specifically designate which test is being requested, rather than actually saying "designate which test." *See* OCGA § 40-5-67.1 (b) (2); OCGA § 40-5-67.1 (a) (providing that "the requesting law enforcement officer shall designate which test or tests shall be administered initially and may subsequently require a test or tests of any substances not initially tested). *But see Collins v. State*, 290 Ga. App. 418, 419-20 (1) (659 SE2d 818) (2008) (holding that an arresting officer's failure to designate the particular State-administered test for which he was requesting consent did not change the substance or meaning of the warning in Georgia's implied-consent notice). But the officer who arrested Jacobs testified he reads the "designate which tests" language "every single time[,]" rather than choosing a test himself.

6

options . . . rather than agree to or refuse all possible testing." But instead of citing any legal authority to support such a conclusion, the trial court merely distinguished the cases relied upon by the State. Ultimately, the trial court found that the officer in this case violated the implied-consent statutes in two ways: (1) by failing to designate any particular test to be conducted; and (2) by converting the final question of the implied consent notice into a multiple-choice inquiry primarily focused on which type of test the defendant would prefer.

The State argues that the trial court erred in suppressing the breath-test evidence because Jacobs's consent to take the breath test was voluntary under the circumstances. As we have previously explained,

> [t]he Fourth Amendment of the United States Constitution and Article
> I, Section I, Paragraph XIII of the Georgia Constitution both protect an
> individual's right to be free of unreasonable searches and seizures, and
> apply with equal force to the compelled withdrawal of blood, breath, and
> other bodily substances.[8]

---

[8] *Young*, 339 Ga. App. at 310 (punctuation omitted). We note that in *Birchfield v. North Dakota*, 579 U.S. ___, ___ (V) (C) (3) (136 SCt 2160, 195 LE2d 560) (2016), the Supreme Court of the United States recently held that the Fourth Amendment allows breath tests under the search-incident-to-arrest exception to the warrant requirement. Because, as explained more fully *infra*, Jacobs gave actual consent to the breath test, we need not decide whether the test was also permitted as a search incident to his arrest.

And because a breath test is "a search within the meaning of the Fourth Amendment, absent a warrant, the State must show that it falls into one of the specifically established and well-delineated exceptions to the warrant requirement."[9] Relevant to this case, "[c]onsent is a valid basis for a warrantless search where it is given freely and voluntarily, and the State does not argue that any other exception might apply."[10] And here, the only question in regard to the validity of the search is "whether the State met its burden of proving that [Jacobs] actually consented freely and voluntarily under the totality of the circumstances."[11]

In Georgia, the voluntariness of consent is "determined by the totality of the circumstances . . . ."[12] Moreover, voluntariness must reflect "an exercise of free will,

---

[9] *Young*, 339 Ga. App. at 310 (punctuation omitted).

[10] *Id.* (punctuation omitted).

[11] *Id.* (punctuation omitted).

[12] *State v. Jourdan*, 264 Ga. App. 118, 121 (1) (589 SE2d 682) (2003) (punctuation omitted); *accord Johnson v. State*, 297 Ga. App. 847, 849 (678 SE2d 539) (2009); *see Williams v. State*, 296 Ga. 817, 819 (771 SE2d 373) (2015) (explaining that a warrantless search is presumed invalid and the State has the burden of proving otherwise); *Young*, 339 Ga. App. at 310 ("[T]he State is required to demonstrate actual consent for State-administered testing for the purpose of exception to the warrant requirement. And in determining whether the defendant gave actual consent to a State-administered breath test, the trial court is required to address the voluntariness of the consent under the totality of the circumstances." (punctuation

8

not merely a submission to or acquiescence in the express or implied assertion of authority."[13] Consequently, in making this determination, we consider several factors, including "prolonged questioning; the use of physical punishment; the accused's age, level of education, intelligence, length of detention, and advisement of constitutional rights; and the psychological impact of these factors on the accused."[14] And no single factor is controlling.[15] Furthermore, consent may not be "coerced, by explicit or implicit means, by implied threat or covert force."[16] Significantly, Georgia courts

omitted)).

[13] *Young*, 339 Ga. App. at 311 (punctuation omitted); *accord State v. Jung*, 337 Ga. App. 799, 802 (788 SE2d 884) (2016).

[14] *Young*, 339 Ga. App. at 311 (punctuation omitted); *accord Jung*, 337 Ga. App. at 802; *see Dean v. State*, 250 Ga. 77, 80 (2) (a) (295 SE2d 306) (1982) ("[T]he voluntariness of a consent to search is determined by looking to the totality of the circumstances, including such factors as the age of the accused, his education, his intelligence, the length of detention, whether the accused was advised of his constitutional rights, the prolonged nature of questioning, the use of physical punishment, and the psychological impact of all these factors on the accused." (citations and punctuation omitted)).

[15] *See Jung*, 337 Ga. App. at 802 (punctuation omitted); *accord State v. Tye*, 276 Ga. 559, 560 (1) (580 SE2d 528) (2003); *see Dean*, 250 Ga. at 80 (2) (a) ("In determining voluntariness [of consent to a search], no single factor is controlling.").

[16] *Kendrick v. State*, 335 Ga. App. 766, 769 (782 SE2d 842) (2016) (punctuation omitted); *accord Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (II) (B) (93 SCt 2041, 36 LEd2d 854) (1973); *Kettle v. State*, 339 Ga. App. 612, 614 (1) (794 SE2d 238) (2016).

have repeatedly held that "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent."[17] Rather, the court should consider whether "a reasonable person would feel free to decline the officers' request to search or otherwise terminate the encounter."[18] Lastly, we note that "[m]ere acquiescence to the authority asserted by a police officer cannot substitute for free consent."[19]

Turning to the circumstances of this case, the evidence shows that, after the officer suspected that Jacobs was too intoxicated to drive safely, he simply read the implied consent notice set forth in OCGA § 40-5-37.1 (b) (2) verbatim, but instead of designating which test he was requesting, he asked Jacobs whether he would

---

[17] *Young*, 339 Ga. App. at 311 (punctuation omitted); *accord Tye*, 276 Ga. at 562 (2); *McKibben v. State*, 340 Ga. App. 89, 94 (796 SE2d 478) (2017); *State v. Bowman*, 337 Ga. App. 313, 317 (787 SE2d 284) (2016); *Kendrick*, 335 Ga. App. at 769.

[18] *Young*, 339 Ga. App. at 311 (punctuation omitted); *accord Jung*, 337 Ga. App. at 802.

[19] *Young*, 339 Ga. App. at 311 (punctuation omitted); *accord Jung*, 337 Ga. App. at 802; *see Tye*, 276 Ga. at 560 (1) (noting that "a showing of mere acquiescence in an officer's authority will not demonstrate the accused's voluntary consensual compliance with the request made of him").

10

choose which test to take.[20] But there was no evidence that the officer used fear, intimidation, threat of physical punishment, or a lengthy detention to obtain Jacobs's consent to the breath test. There was also no evidence, and the trial court did not find, that the officer used physical force or the threat of such force to coerce Jacobs into agreeing to the breath test. In fact, the officer testified that he did no such thing, and other than reading the implied-consent notice, he and Jacobs had no further discussions regarding his consent to the breath test. Moreover, there was no evidence that Jacobs's age, intelligence, or level of education hindered his ability to understand the implied-consent notice. To the contrary, evidence showed that Jacobs exercised his right to refuse to take any field-sobriety tests, which indicates that he was not so intoxicated that he could not make an informed decision regarding consent. Lastly, the officer, who was the sole person to observe Jacobs at the time, testified that when Jacobs consented to the breath test, he "seemed to understand . . . what [the officer] was asking of him[.]"

---

[20] At the conclusion of the implied-consent notice, the officer asked, "*Will you* submit to the State-administered chemical test of your designated—designate which one under the Implied Consent Law?" (Emphasis supplied). Thus, contrary to the trial court's finding, the question appears to be asking *if* Jacobs would choose a test, rather than asking him to answer a "multiple[-]choice inquiry."

11

Here, without discussing the totality of the circumstances or any of the factors delineated *supra* (other than Jacobs's knowledge of the right to refuse testing), the trial court suppressed the breath-test evidence solely because the officer failed to designate the specific test that would be administered, and the last question in the implied-consent notice "would lead a reasonable person to believe that the purpose of the question is to choose which test or tests would be administered, rather than to prompt a yes-or-no response as to whether the test would be administered in the first place." But neither of those bases require the suppression of the breath-test results. Indeed, we have held that the results of chemical testing were admissible in cases in which the arresting officer listed the chemical tests available, but did not designate which test would be conducted.[21] In doing so, we explained that "[t]he determinative

---

[21] *See Jones v. State*, 319 Ga. App. 520, 522-24 (737 SE2d 318) (2013) (affirming the trial court's denial of a motion to suppress breath-test results when the officer listed the chemical tests available, requested and obtained consent to a blood test, but the defendant ultimately submitted to a breath test); *Nagata v. State*, 319 Ga. App. 513, 515-16 (736 SE2d 474) (2013) (holding that the officer's failure to specify the test for which he was requesting consent did not invalidate the defendant's consent to a breath test when, as here, the officer informed the defendant of the different tests available, including a breath test); *Collins*, 290 Ga. App. at 420 (1) (holding that the notice given was sufficiently accurate to permit the defendant to make an informed decision about whether to consent to chemical testing when the officer listed all of the tests available and allowed the defendant to choose which test to take).

12

issue with the implied[-]consent notice is whether the notice given was substantively accurate so as to permit the driver to make an informed decision about whether to consent to testing."[22] Similarly, here, we conclude that "because the implied[-]consent warning begins by advising the defendant that Georgia law requires you to submit to state administered chemical tests of your blood, breath, urine or other bodily substances, the [officer's] failure to designate the specific test to be performed did not change the substance or meaning of the implied[-]consent warning."[23]

Moreover, as to Jacobs's possible confusion regarding whether he could refuse to consent to any chemical testing, we reiterate that knowledge of the right to refuse consent is only *one factor* to be taken into account, and the State need not demonstrate such knowledge as an absolute requirement to show effective consent.[24]

---

[22] *Jones*, 319 Ga. App. at 522 (punctuation omitted); *accord Nagata*, 319 Ga. App. at 515; *Collins*, 290 Ga. App. at 420 (1).

[23] *Jones*, 319 Ga. App. at 522 (punctuation omitted); *see Nagata*, 319 Ga. App. at 515 ("We do not see how the officer's failure to designate the test to be taken changed the substance or meaning of the warning in the implied consent notice. [The defendant] was under notice that the state-administered chemical tests would be of his blood, breath, urine or other bodily substances. The notice given was sufficiently accurate to permit [the defendant] to make an informed decision about whether to consent to testing." (punctuation omitted)); *Collins*, 290 Ga. App. at 420 (1) (same).

[24] *See supra* note 17 & accompanying text.

13

Furthermore, considering the implied-consent notice as a whole and without isolating the final question, the notice as read to Jacobs made clear that he had the right to refuse testing. Specifically, after informing Jacobs that Georgia law required him to submit a State-administered chemical test of his blood, breath, urine, or other bodily substance, the officer advised him of the consequences that would occur *if he refused*, suggesting that refusal was an option. The officer advised that *if Jacobs refused* to consent to one of the tests, his driver's license would be suspended for at least one year and that *his refusal* to submit to the required testing could be used as evidence against him at trial. The officer also advised that *if Jacobs agreed* to the testing and the results indicated alcohol consumption of 0.08 grams or more, his license would be suspended for at least a year. And after informing Jacobs of the various consequences of his choice to refuse or consent to testing, the officer did not even demand that Jacobs choose which test to take. Instead, he asked Jacobs *if* he would submit to the State-administered chemical test of his choice.[25] Notwithstanding that the implied-consent notice repeatedly indicated that Jacobs had the right to refuse testing and suffer the consequences, the trial court ignored all of the other relevant factors in determining whether consent was voluntary and improperly relied on a

---

[25] *See supra* note 20.

single relevant factor: its finding that the way in which the implied-consent notice was read would lead a "reasonable person" to believe that he or she did not have the right refuse testing. But even accepting the court's finding in that respect, we must consider *all* of the circumstances surrounding Jacobs's agreement to submit to the breath test because no single factor controls.[26]

In this case, the record shows that the officer read the implied-consent notice verbatim with no further comments, threats, or coercion; Jacobs appeared to understand and answer the officer's questions appropriately; there was no evidence that Jacobs's youth or lack of education impaired his ability to consent; and Jacobs was advised of the various consequences of his *refusal* to consent to any testing. As a result, we are persuaded that the State satisfied its burden of establishing that Jacobs's consent to the breath test was voluntary.[27]

---

[26] *See supra* notes 12 and 15 & accompanying text.

[27] *See McKibben*, 340 Ga. App. at 94 (affirming the denial of a defendant's motion to suppress blood-test results, even though the defendant claimed that the language of the implied-consent notice made him feel as though he had no choice but to consent when the defendant answered affirmatively to the question posed by the implied-consent notice, he never attempted to change that answer prior to testing, he did not appear to be impaired to the extent that he did not understand the question, he did not object to the test, and the officer did not force him to take it); *Young*, 339 Ga. App. at 311-12 (reversing the trial court's suppression of breath-test evidence even though the defendant was in handcuffs at the time consent to the test was

15

For these reasons, we reverse the trial court's grant of his motion to suppress the breath-test evidence.

*Judgment reversed. Ray, P. J. and Self, J., concur.*

---

requested, the defendant was not informed that the test was not mandatory, and the officer asked for her consent to be tested without specifying that the test would be of her bodily substances, when the evidence did not show that the officer used fear, intimidation, threat of physical punishment, a lengthy detention, or coercion to obtain consent; the trial court did not find that her youth, education, or low intelligence negated the voluntariness of her consent; and the implied-consent notice read to her accurately reflected Georgia law); *Kendrick*, 335 Ga. App. at 769 (affirming the denial of the defendant's motion to suppress breath-test results when, even though the defendant claimed that she was not informed of her constitutional right against unreasonable searches and seizures and that being in handcuffs made her feel as though she had to consent to testing, there was no evidence that the officers used fear, intimidation, threat of physical punishment or a lengthy detention to obtain consent; the officer and the defendant conducted themselves calmly during the encounter; and there was no allegation that her youth, lack of education, or low intelligence negated the voluntariness of her consent); *see also* note 21 *supra.*

16