**FOURTH DIVISION**
**RICKMAN, C. J.,**
**DILLARD, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 1, 2023**

# In the Court of Appeals of Georgia

A23A0593. LOPEZ-LOPEZ v. THE STATE.

DILLARD, Presiding Judge.

Following a jury trial, Edgar Lopez-Lopez was convicted of aggravated assault and possession of a knife during the commission of a felony based on evidence that he stabbed one of his roommates. On appeal, Lopez-Lopez argues the trial court erred by denying his motion to suppress certain incriminating statements he made during a police interview prior to his arrest. For the following reasons, we reverse.

Viewed in the light most favorable to the jury's verdict,[1] the record shows that, during the relevant time period, Lopez-Lopez[2] lived in an apartment with the victim,

---

[1] *See, e.g.*, *Cawthon v. State*, 350 Ga. App. 741, 741 (830 SE2d 270) (2019).

[2] Lopez-Lopez's full name is Edgar Ovaldo Lopez-Lopez, and some witnesses at trial referred to him as "Ovaldo."

Antonio Erazo, Melvin Erazo (Antonio's uncle), Lauro (last name unknown), and a family of three—Evelyn Aguilar, Francisco Aguilar, and Catherine Aguilar.[3] On January 1, 2018, Evelyn awoke at approximately 5:30 a.m. to use the bathroom, and when she entered that room, she saw blood stains all over the bathtub. She also noticed bloodstained shoes in the bathtub. At this point, Evelyn called for Francisco, and after he saw the blood, he went into Lopez-Lopez's bedroom because Lopez-Lopez and some of his roommates often opened beer bottles with a knife. So, at first, Evelyn and Francisco believed someone may have cut themselves while opening a beer.

From the hallway, Evelyn could see Lopez-Lopez was asleep on his bed without any cuts or other injuries to his body. Evelyn and Francisco then went into the victim's bedroom and saw him lying unconscious on the floor. Then, after turning the light on, they found a kitchen knife on the floor near the victim. At this point, after unsuccessfully attempting to call his boss, Francisco called a coworker "because [they] were thinking about taking the victim to the hospital" and needed his help to do so. Eventually, Francisco's boss and coworker both came to the apartment and

[3] Evelyn and Francisco are married and Catherine is their daughter. Because several of Lopez-Lopez's roommates have the same last name, we will refer to them by their first names.

went inside. Francisco took the men to the victim's bedroom, where they lifted his shirt and saw "wound marks . . . filled with blood." Then, instead of taking him to the hospital, Francisco's coworker called 911 to report the incident.

Detective James Glassman—a "uniformed road officer" with the Gwinnett County Police Department ("GCPD") —was the first officer on the scene, and two other officers arrived shortly after that. Officer Glassman and the other officers went to the victim's bedroom and discovered that the victim—who was "surrounded" by blood—had stab wounds to his neck and back.[4] And by this point, everyone other than the victim and Lopez-Lopez had exited the house and gone outside.

Evan Nelson—who was also a police officer with the GCPD—accompanied Officer Glassman when he discovered the victim and found Lopez-Lopez lying in bed. After waiting for a police officer who spoke Spanish to arrive, Officer Nelson learned that Lopez-Lopez was "okay and not hurt." Officer Nelson then placed Lopez-Lopez in the back of a patrol car until detectives arrived because "[s]omebody was hurt in his apartment one room over[,] [a]nd he had dried blood all over him, but he was not hurt or cut." Given these circumstances, Officer Nelson believed they

---

[4] The victim's wounds were nonfatal, and he was able to testify at trial that Lopez-Lopez was the person who stabbed him.

"needed to figure out whose blood was on him." Eventually, Officer Nelson transported Lopez-Lopez to the GCPD headquarters in a marked patrol car and accompanied him to an interview room. According to Officer Nelson, Lopez-Lopez was not under arrest at this time, but "he wasn't free to leave due to blood on his body and no cuts on his person." Some of Lopez-Lopez's roommates also traveled to the police station and were placed in separate interview rooms; but unlike Lopez-Lopez, they were driven there by a friend.

Once in the interview room, Brian Dorminy—a detective with the GCPD's homicide and assault unit[5]—initially began interviewing Lopez-Lopez before taking breaks to interview his roommates—including Evelyn, Francisco, and Melvin. Those interviews lasted approximately 30 minutes, but Lopez-Lopez's interview lasted at least four hours. At first, Lopez-Lopez claimed he was covered in blood because he attempted to help the victim, but he also said he could not remember what happened that morning. Then, later in the interview, Lopez-Lopez stated, "I must be to blame, I must be at fault[,]" but he also said the stabbing could have been an accident. Eventually, sometime during the last hour of the interview, Lopez-Lopez admitted to

_____

[5] Detective Dorminy was one of the detectives that responded to the crime scene.

4

being the person who stabbed the victim, saying, "I'm the guilty one." Ultimately, after interviewing Evelyn, Francisco, and Melvin (whose statements were inconsistent with Lopez-Lopez's statements), Detective Dorminy believed Lopez-Lopez was "probably guilty of this crime." As a result of this investigation, Dorminy arrested Lopez-Lopez for aggravated assault and advised him of his *Miranda*[6] rights.

Thereafter, Lopez-Lopez was charged, via indictment, with aggravated assault and possession of a knife during the commission of a felony. Prior to trial, Lopez-Lopez filed a motion to suppress certain incriminating statements that he made during his interview with Detective Dorminy prior to his arrest, but the court denied his motion. Lopez-Lopez renewed his objection to the admission of these statements at the outset of trial, and the trial court acknowledged his objection but did not change its ruling. Following a jury trial, Lopez-Lopez was convicted of both charged offenses. Then, after obtaining new counsel, Lopez-Lopez filed a motion for a new trial, which the trial court denied after a hearing. This appeal follows.

---

[6] *See Miranda v. Arizona*, 384 U. S. 436, 444-45 (III) (86 SCt 1602, 16 LE2d 694) (1966) (holding that the Fifth Amendment bars the admission of an accused's statements made during a custodial interrogation, unless he first is advised of and voluntarily waives his right to remain silent and not incriminate himself); U.S. Const. amend. V ("No person shall be compelled in any criminal case to be a witness against himself."); Ga. Const. art. I, § 1, ¶ XVI ("No person shall be compelled to give testimony tending in any manner to be self-incriminating.").

In his sole claim of error, Lopez-Lopez argues the trial court erred in denying his motion to suppress certain incriminating statements that he made prior to his formal arrest and before being advised of his *Miranda* rights. We agree.

In reviewing a trial court's ruling on a motion to suppress, an appellate court generally must "(1) accept a trial court's findings unless they are clearly erroneous, (2) construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court, and (3) limit its consideration of the disputed facts to those expressly found by the trial court."[7] But this Court reviews "de novo the trial court's application of law to the undisputed facts."[8] Bearing these guiding principles in mind, we turn now to Lopez-Lopez's only claim of error.

---

[7] *State v. Jacobs*, 342 Ga. App. 476, 477 (804 SE2d 132) (2017) (punctuation omitted); *accord Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015). Here, the trial court did not make any oral or written findings of fact, and it was not required to do so. *See Bryant v. State*, 326 Ga. App. 385, 386 (756 SE2d 621) (2014) ("[A] trial judge is not required to make findings of fact after a hearing on a motion to suppress." (punctuation omitted)) Nevertheless, there are no disputed facts in this case because only one witness testified at the suppression hearing.

[8] *Jacobs*, 342 Ga. App. at 477 (punctuation omitted); *see Hughes*, 296 Ga. at 750 (2) ("Although we owe substantial deference to the way in which the trial court resolved disputed questions of material fact, we owe no deference at all to the trial court with respect to questions of law, and instead, we must apply the law ourselves to the material facts.").

6

The Supreme Court of the United States has construed the Fourth Amendment to the United States Constitution[9] as setting forth three tiers of police-citizen encounters:[10] "(1) communication between police and citizens involving no coercion or detention . . . , (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause."[11] As to a third-tier encounter, "[t]he test for determining whether a person has been placed under custodial arrest is whether the individual was formally arrested *or restrained to a degree associated with a formal arrest*, not whether the police had probable cause to arrest."[12] And as to whether someone is restrained to a degree associated with a

---

[9] *See* U.S. CONST. amend IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."); *see also* Ga. Const. art. I, § 1, ¶ XIII (The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause supported by oath or affirmation particularly describing the place or places to be searched and the persons or things to be seized.").

[10] *Miller v. State*, 351 Ga. App. 757, 761 (1) (833 SE2d 142) (2019); *see State v. Walker*, 295 Ga. 888, 889 (764 SE2d 804) (2014) (noting that Fourth Amendment jurisprudence recognizes three tiers of police-citizen encounters).

[11] *Miller*, 351 Ga. App. at 761 (1) (punctuation omitted); *accord Ewumi v. State*, 315 Ga. App. 656, 658 (1) (727 SE2d 257) (2012).

[12] *Galindo-Eriza v. State*, 306 Ga. App. 19, 23-24 (1) (701 SE2d 516) (2010) (punctuation omitted) (emphasis supplied); *accord Suluki v. State*, 302 Ga. App. 735,

formal arrest, "[t]he test is whether a reasonable person in the suspect's position would have thought the detention would not be temporary."[13] As a result, a trial court deciding whether to "admit evidence must apply this objective test; it is the reasonable belief of an ordinary person under such circumstances, and not the subjective belief or intent of the officer, that determines whether an arrest has been effected."[14] Importantly, our Supreme Court has explained that *Miranda* warnings must be "administered to an accused who is in custody and subject to interrogation or its functional equivalent."[15]

---

738 (1) (691 SE2d 626) (2010).

[13] *Galindo-Eriza*, 306 Ga. App. at 24 (1) (punctuation omitted) (emphasis supplied); *accord Suluki*, 302 Ga. App. at 738 (1); *see State v. Walden*, 311 Ga. 389, 390 (858 SE2d 42) (2021) (explaining that "[i]n determining whether a suspect is in custody, we must consider the totality of the circumstances without regard for the subjective views of the suspect or the interrogating officer").

[14] *Galindo-Eriza*, 306 Ga. App. at 24 (1) (punctuation omitted); *accord Suluki*, 302 Ga. App. at 738 (1); *see Wright v. State*, 362 Ga. App. 867, 870 (1) (870 SE2d 484) (2022) ("[A] custodial situation does not arise even if an officer believes he has probable cause to arrest a defendant, [when] the officer takes no overt step to communicate that belief." (punctuation omitted))

[15] *State v. Troutman*, 300 Ga. 616, 617 (1) (797 SE2d 72) (2017); *accord Walden*, 311 Ga. at 389.

In this case, it is undisputed Lopez-Lopez made several incriminating statements toward the end of his *four-hour* interview with Detective Dorminy and before he was read his *Miranda* rights.[16] Specifically, prior to being read those rights, Lopez-Lopez said he was the one to blame for the stabbing, he was "the guilty one[,]" and "[m]aybe [he] attacked [the victim]." These statements were made immediately after Dorminy claimed Lopez-Lopez's fingerprints were found on the knife. But *after* Lopez-Lopez was arrested and advised of his *Miranda* rights, he maintained that he was too drunk to remember what happened the morning the victim was stabbed, his fingerprints might be on the knife because he used it to cut lemons, and the blood on his shirt was there because he tried to help the victim after he was stabbed.

As previously mentioned, Lopez-Lopez maintains the incriminating statements at issue should have been suppressed because—although he had not been formally arrested at the time he made them—he was restrained to a degree associated with a formal arrest and interrogated by police. In this regard, Detective Dorminy—who was

---

[16] Lopez-Lopez's interview was recorded, but it was conducted in Spanish, so the jury was given a transcript that translated it into English. So, although it is unclear exactly what time Lopez-Lopez was arrested and given his *Miranda* warnings, the warnings occurred on page 148 of the 166-page transcript. Detective Dorminy also testified that he advised Lopez-Lopez of his *Miranda* rights "probably in the last hour."

the only witness at the suppression hearing—testified as follows. When law enforcement arrived on the scene, they placed Lopez-Lopez—who was covered in blood and vomit—in the back of a patrol car, where he remained for approximately an hour and a half. And while confined in the patrol car, Lopez-Lopez was unable to exit the car because there were no handles on the inside of the vehicle. Nevertheless, Dorminy believed Lopez-Lopez was free to leave because he could have knocked on the window and asked an officer to let him out; but Dorminy acknowledged that no law enforcement officers ever informed Lopez-Lopez that he could exit the car by doing so.[17]

In stark contrast, although Lopez-Lopez was transported to the GCPD headquarters in the back of a patrol car, Francisco, Evelyn, and Melvin were

---

[17] *See Walden*, 311 Ga. at 393 (1) (noting one factor that *may* support a determination that a defendant was in custody for *Miranda* purposes is when the defendant is never told by law enforcement that he was free to leave); *State v. Abbott*, 303 Ga. 297, 300-201 (812 SE2d 225) (2018) (considering, *inter alia,* that a defendant was never told he was free to leave in determining he was in custody for *Miranda* purposes). At trial, Officer Nelson disagreed with Detective Dorminy, testifying that, although Lopez-Lopez was not under arrest at the relevant time, "he wasn't free to leave due to blood on his body and no cuts on his person." But in determining whether a defendant was restrained to the degree associated with a formal arrest, "it is the reasonable belief of an ordinary person under such circumstances, and not the subjective belief or intent of the officer, that determines whether an arrest has been effected." *Galindo-Eriza*, 306 Ga. App. at 24 (1) (punctuation omitted).

10

permitted to drive separately and go there on "their own accord."[18] And while Lopez-Lopez was never handcuffed, he—unlike his roommates—was taken to the station in a patrol car, which entered a secured, gated parking lot not open to the public. Then, once he arrived, a uniformed police officer with a gun escorted Lopez-Lopez from the parking lot into an interview room.

Upon his arrival at the police station, Detective Dorminy contends that he did not consider Lopez-Lopez to be a suspect, but merely wanted to interview him "[t]o find out what happened." And during this interview, Lopez-Lopez never expressed a desire to leave the interview room or the police station. Dorminy estimated that Lopez-Lopez's interview—during which time he was in police "custody"—lasted approximately "four hours plus."

So, considering the foregoing undisputed evidence (and giving the requisite amount of deference to the trial court), we agree with Lopez-Lopez that a reasonable person in his position would not have considered his detention to be temporary in nature because he was restrained to the degree associated with a formal arrest and

---

[18] Detective Dorminy testified that Lopez-Lopez was transported in the patrol car because he did not have a valid driver's license, but he did not explain why Lopez-Lopez was not allowed to go to the station with his roommates, who were driven by a friend.

subjected to a police interrogation without first being read his *Miranda* rights.[19]

Indeed, even before being transported in a patrol car to the police station, Lopez-Lopez was *locked* in the car and unable to leave on his own for at least *an hour and a half*. Then, unlike the others interviewed by law enforcement, he was taken in a patrol car into a private, gated, and secured parking lot before being escorted by a uniformed, armed police officer to an interrogation room. After that, he remained in that room and was interviewed for more than *three hours* before he was arrested and given his *Miranda* warnings. And needless to say, it is of no consequence that Detective Dorminy subjectively believed Lopez-Lopez could have left at any time.[20] As a result of the foregoing circumstances, the trial court erred in denying Lopez-Lopez's motion to suppress the incriminating statements he made during his interview with Detective Dorminy.[21]

---

[19] *See supra* notes 12-14 & accompanying text.

[20] *See supra* note 13 and accompanying text.

[21] *See Troutman*, 300 Ga. at 617-18 (1) (holding the trial court did not err in determining a reasonable person in defendant's position would have believed he was in custody when record supported trial court's findings that defendant was kept at the police station in a non-public area for nearly nine hours, was interviewed three times, was never advised he was free to leave, and was explicitly told he was not allowed to leave); *State v. Folsom*, 286 Ga. 105, 108 (1) (686 SE2d 239) (2009) (holding that trial court did not err in concluding a reasonable person would believe he was in

12

For all these reasons, we reverse the trial court's denial of Lopez-Lopez's motion for a new trial, and remand this case for further proceedings consistent with this opinion.

*Judgment reversed. Rickman, C. J., and Pipkin J., concur.*

---

police custody when defendant was never told he was free to leave, was kept either under surveillance or in a closed interrogation room for six hours, was explicitly told that the evidence pointed at him, and was essentially required to come to the police station by officers who waited at his home and ensured he arrived at the police station by following him), *overruled on other grounds by State v. Abbott*, 303 Ga. 297 (812 SE2d 225) (2018); *Gardner v. State*, 261 Ga. App. 10, 11 (582 SE2d 7) (2003) (holding that a trial court erred when it did not suppress a defendant's un-*Mirandized* statements when they were made in response to a detective's summary of evidence against him [such as, in this case, telling Lopez-Lopez that his fingerprints were on the knife immediately before he made the incriminating statements] because the detective "should have known that if he advised [the defendant] of the incriminating evidence against him, it was reasonably likely that [the defendant's] response would prove incriminating to some degree"). *Cf. Walden*, 311 Ga. at 395-96 (affirming the trial court's determination that defendant was not in custody for *Miranda* purposes when she voluntarily agreed to go to the police station, waited for the investigator for less than an hour, and the door to the interview room remained open); *McAllister v. State*, 270 Ga. 224, 226-228 (1) (507 SE2d 448) (1998) (holding that the trial court was authorized to find defendant was not in custody when investigator assured defendant "that he was not under arrest or being detained" and that he was free to leave at any time, the door remained open while defendant provided written answers to written questions for 15 minutes, and afterwards, the detective asked the defendant about her questions for one to two hours).

13