**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**BRANCH and BETHEL, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**September 14, 2017**

# In the Court of Appeals of Georgia

A17A1043. TAYLOR v. THE STATE.

BETHEL, Judge.

Derwin Miles Taylor appeals from the denial of his motion for a new trial following his conviction on a single count of trafficking in marijuana, for which he was sentenced to 30 years imprisonment. On appeal, as in his motion for a new trial, he contends that the trial court erred in pretrial proceedings by denying his motion to suppress evidence obtained from a search of his vehicle during a traffic stop. Because we agree with the trial court that the law enforcement officer who stopped Taylor articulated a reasonable suspicion of criminal activity sufficient to allow him to detain Taylor for further investigation, we affirm the trial court's denial of Taylor's motion to suppress and his motion for a new trial.

On appeal from a denial of a motion to suppress, "this Court must construe the evidence most favorably to uphold the ruling of the trial court." *Jones v. State*, 253 Ga. App. 870, 870 (560 SE2d 749) (2002) (citation omitted). The "trial court's application of law to facts which are undisputed is subject to de novo review." *Id*. (citation omitted).

Here, the relevant evidence consisted entirely of testimony at a hearing on Taylor's motion to suppress by the deputy who performed the search on Taylor's vehicle. The deputy was a canine handler with the county's uniform patrol division. He testified that he stopped Taylor while driving on Interstate 75 for failure to maintain lane and for having window tint that was too dark. As Taylor was providing the deputy with his license and registration, the deputy observed in Taylor's car numerous air fresheners and packages that were releasing an "overwhelming" odor of air freshener. The deputy also noticed Taylor's hands shaking as he provided his license and registration, a reaction the deputy took as a sign of nervousness on Taylor's part.

Taylor exited his vehicle at the deputy's request, and he stood outside the vehicle as the deputy wrote two traffic warnings for Taylor. The two had a prolonged discussion outside the vehicle in which Taylor answered a number of the deputy's

questions, including where he was coming from at the time of the traffic stop. Taylor told the deputy he had been in Atlanta visiting his uncle in the hospital but struggled to identify where he was hospitalized or why he was sick. The deputy also testified that, in the course of their discussion, Taylor gave conflicting statements about where he had stayed the night before, first telling him that he stayed in an apartment and later saying that he had stayed in a hotel.

During a break in this conversation, the deputy stepped away for a moment to call for backup and then returned to speak to Taylor again.[1] The deputy completed the forms for the two warnings and then placed a call to the dispatcher with Taylor's driver's license and tag number. The deputy then asked Taylor for consent to search his vehicle, telling Taylor that he was aware of "a lot of criminal activity going up and down this interstate." Taylor refused the deputy's request for consent to search. At that time, the deputy was still holding Taylor's license and registration along with a written warning for the traffic offenses, and the dispatcher had not yet confirmed Taylor's license and registration information.

---

[1] The deputy testified that he called for backup at this point in his encounter with Taylor because he noted so many "red flags" and believed that "more than just a normal routine traffic stop" was unfolding. The deputy further explained that he called for backup before seeking Taylor's consent to search the vehicle out of concern for safety.

3

After Taylor refused to allow the deputy to search the vehicle, the deputy indicated to Taylor that he was going to bring over a K-9 dog with specialized narcotics training to sniff Taylor's vehicle. As the deputy was walking to his patrol car to retrieve the dog, the dispatcher replied to the deputy confirming Taylor's license and registration information. After collecting the dog from his patrol car, the deputy brought the dog to Taylor's car to conduct a sniff of the vehicle. The dog provided a positive response to the sniff, and the deputy proceeded to search Taylor's vehicle, whereupon he found a large suitcase in the trunk containing a significant quantity of marijuana.

Taylor was arrested and charged with trafficking in marijuana. Before trial, Taylor moved to suppress all evidence seized from his vehicle by the deputy. The trial court denied the motion through a series of orders.[2] A bench trial followed at which evidence from the search of the vehicle was admitted. Taylor was convicted, and he filed a motion for a new trial. The trial court denied that motion, and this appeal followed.

---

[2] After reconsideration and a second hearing, the trial court again denied the motion to suppress. The trial judge filed a certificate of immediate review, but this Court denied Taylor's petition for leave to file an interlocutory appeal. *See* Case number A16I019.

Taylor argues that the deputy lacked a reasonable articulable suspicion of criminal activity sufficient to detain Taylor for a drug sniff of the vehicle after the purpose of the traffic stop had concluded. Absent such reasonable suspicion, the extension of an otherwise completed traffic stop in order to conduct a free-air search of a vehicle using a drug dog violates the Fourth Amendment's protection against unreasonable searches and seizures. *Rodriguez v. United States*, 135 SCt 1609, 1614 (191 LEd2d 492) (2015). An officer who initiates a lawful traffic stop, however, can shift into a criminal investigation so long as the officer can articulate reasonable suspicion that criminal activity is occurring. *See Rodriguez v. State*, 295 Ga. 362, 369 (761 SE2d 19) (2014).

> To satisfy this "reasonable suspicion" standard, the officer's investigation must be justified by specific articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct. Articulable suspicion requires a particularized and objective basis for suspecting that a citizen is involved in criminal activity. Although this suspicion need not meet the higher standard of probable cause, it must be more than a mere caprice or a hunch.

*State v. Whitt*, 277 Ga. App. 49, 50 (625 SE2d 418) (2005) (citation and emphasis omitted).

5

> To determine whether a reasonable articulable suspicion exists, courts must look to the totality of the circumstances. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*State v. Thompson*, 256 Ga. App. 188, 189-90 (569 SE2d 254) (2002) (citations and punctuation omitted). Ultimately, "[t]he State bears the burden of proving that the search of the car was lawful, and to carry this burden, the State must show that it was lawful to detain [the defendant] until the time the drug dog indicated the presence of drugs." *Dominguez v. State*, 310 Ga App. 370, 372 (714 SE2d 25) (2011) (citation omitted).

Here, we agree with the trial court that the State has carried this burden, as the totality of circumstances encountered by the deputy at the scene allowed him to form the requisite level of suspicion necessary to convert the traffic stop into a broader criminal investigation. The trial court found that Taylor's supposed nervousness was not a factor, on its own, that the deputy could consider in forming a reasonable suspicion of criminal activity, and we agree with that determination. *See Barraco v. State*, 244 Ga.App. 849, 852(2)(b), 537 S.E.2d 114 (2000) ("[e]ven when other factors are present, nervous behavior of a person who has been stopped by an armed law enforcement officer is not an unusual response and is not necessarily strong

6

evidence to support either reasonable suspicion or probable cause"). However, the trial court determined, and we agree, that the strong smell of air fresheners in the vehicle, Taylor's vague and conflicting statements about his uncle's illness and his own whereabouts the night before, and the location of the traffic stop along a stretch of Interstate 75 that was known by the deputy to be a drug trafficking corridor were factors that allowed the deputy to form and articulate a reasonable suspicion of drug activity.

Taylor suggests that this Court's decision in *State v. Thompson*[3] demonstrates that the trial court's determination was in error, arguing that *Thompson* indicates that the occurrence of a stop along an interstate highway known to be a trafficking corridor is not a sufficient basis of suspicion. In *Thompson*, when the stop was initiated, the officer noted that the defendant was nervous and that there was a strong smell of detergent and air fresheners coming from the car. 256 Ga. App. at 188. These were the only bases of suspicion articulated by the officer who initiated the stop, even though the opinion in *Thompson* reflects that the stopped occurred along Interstate 20. This Court again discounted the view that nervousness alone could form a sufficient basis of suspicion, and ruled that "[a]lthough laundry detergent and dryer

[3] 256 Ga. App. 188, 189 (569 SE2d 254) (2002).

7

sheets can be used to mask the odor of an illegal substance, they are themselves legal substances that can be used for a legal purpose and thus do not justify the officer's further detention of [the defendant] *under the facts of this case*." *Id*. at 189 (emphasis supplied). Taylor thus suggests that because his interactions with the officer, the presence of air fresheners, and his location on Interstate 75 were the only factors the deputy could consider in forming a suspicion, *Thompson* controls our analysis. We disagree.

In this case, Taylor argues that it is "common knowledge" that Interstate 20 is "just as much a drug corridor" as Interstate 75 and that the outcome of this case should be identical to that in *Thompson*. However, in *Thompson*, even though the facts set forth in this Court's opinion show that the stop occurred on Interstate 20, it does not appear that the officers in that case articulated the location of the stop as a basis for their suspicion or that the court considered evidence that the area was a known trafficking corridor. Thus, in *Thompson*, the officers were relying solely on their observation of the defendant's nervousness and the smell of detergent and air freshener in forming their suspicion. *See Id*. at 190.

In this case, however, the trial court determined that the overwhelming smell of air fresheners, the location of the stop along the interstate, *and* Taylor's

8

inconsistent statements to the deputy were all factors that, in totality, could allow the deputy to form the required suspicion. As this Court's decisions in *Wilson v. State*[4] and *Richbow v. State*[5] indicate, the strong odor of air freshener along with other seemingly innocuous activities may allow an officer to form a reasonable suspicion that criminal activity is taking place.[6] Additionally, an officer may consider conflicting or vague stories presented by a person in the vehicle[7] and the "modes or patterns of operation of certain kinds of lawbreakers" in forming reasonable suspicion of criminal activity. *Thompson*, 256 Ga. at 189 (citations omitted). Though we acknowledge that Interstate 75, like any other public thoroughfare, may be traveled for legitimate purposes, we are not blind to the considerable experience of law enforcement agencies in dealing with those who use major interstate highways to

---

[4] 306 Ga. App. 286, 287-89 (2) (a)-(b) (702 SE2d 2 (2010).

[5] 293 Ga. App. 556, 559 (667 SE2d 418) (2008).

[6] *See also Vega v. State*, 321 Ga. App. 682, 684 (742 SE2d 499) (2013) (recognizing that, faced with other suspicious behaviors, officers may permissibly infer that drivers who use strong air fresheners are doing so to hide the smell of drugs or confuse drug-sniffing dogs).

[7] *Wilson*, 306 Ga. App. at 289 (noting conflicts in statements made by vehicle's occupants and defendant's inability to identify the location he had just visited as factors the officer could consider in forming suspicion).

transport illegal substances. We are also cognizant that an experienced and properly trained law enforcement officer may conclude that otherwise lawful activity which takes place on a "known drug route" is actually evidence of ongoing criminal activity.[8] *See Giles v. State*, 284 Ga. App. 1, 1-3 (1) (642 SE2d 921) (2007). Thus, because the facts of this case show that factors in addition to those considered in *Thompson* formed part of the deputy's suspicion, *Thompson* is inapposite to our analysis.

We thus conclude that although Taylor's conduct observed by the officer at the time of the stop in this case may have been "susceptible to an innocent explanation, it is also consistent with illegal activity." *Id.* at 4 (citations and punctuation omitted). Accordingly, we agree with the trial court that the totality of the circumstances

[8] This case aptly illustrates this point. The video of the traffic stop captured by the dashboard camera on the deputy's patrol car shows that, upon discovering a large package containing marijuana in Taylor's car, the deputy gleefully exclaimed to Taylor, "this ain't my first rodeo!" While an officer's training and experience alone do not provide an officer carte blanche to initiate drug investigations, our cases do credit an officer's training and experience as factors to be considered when evaluating otherwise lawful actions than an officer may interpret as "red flags" during a traffic stop. *See, e.g., Wilson*, 306 Ga. App. at 289 (officer's "knowledge of drug trafficking in the area" was factor in upholding determination of reasonable suspicion); *Giles*, 284 Ga. App. at 4 (noting arresting officer's "extensive interdiction training and knowledge of drug smuggling patterns"); *State v. Causey*, 246 Ga. App. 829, 833 (1) (b) (540 SE2d 696) (2000) (noting that officers' "first-hand experience" with similar offenses informs reasonable conclusions that criminal activity is taking place).

encountered by the deputy–namely, the smell of air fresheners, the location of the stop along what the officer knew to be a trafficking corridor, and the vague and conflicting stories offered by Taylor–allowed him to form the reasonable suspicion necessary to commence a criminal investigation. We therefore affirm the trial court's denial of Taylor's motion to suppress, and, in turn, its denial of his motion for a new trial.

*Judgment affirmed. McFadden, P. J.,concurs specially. Branch, J., concurs.*

A17A1043. TAYLOR v. THE STATE.

McFADDEN, Presiding Judge, concurring specially.

The 20 to 25 air fresheners that were in use in Taylor's car are strong evidence, for which there is no likely innocent explanation. Cf. *State v. Thompson*, 256 Ga. App. 188, 190 (569 SE2d 254) (2002) ("Although laundry detergent and dryer sheets can be used to mask the odor of an illegal substance, they are themselves legal substances that can be used for a legal purpose and thus do not justify the officer's further detention of Thompson under the facts of this case.") That evidence is bolstered by the evidence that the stop took place on a known drug route and by the trial court's written finding, which the evidence supports, that Taylor's hands were shaking when the deputy stopped him, even though the trial court characterized that

evidence as "relatively insignificant" when he announced his ruling at the end of the suppression hearing. Those items are sufficient on the facts of this case to sustain a finding of reasonable suspicion.

So I would not reach the question whether Taylor's vague and conflicting statements about his uncle's illness and his own whereabouts the night before constitute meaningful inconsistencies. See *Nash v. State*, 323 Ga. App. 438, 443 (746 SE2d 918) (2013); *Migliore v. State*, 240 Ga. App. 783, 786 (525 SE2d 166) (1999).

And I would avoid any suggestion that we defer to officers' training and experience when we perform the analysis required of us by the Fourth Amendment. In the first place, the case would not be here if drugs had not been found. I do not doubt that such training and experience enable officers to make determinations that other persons, including judges, could not make — such as determinations about "drug smuggling patterns, combined with [] objective observations indicating criminal activity in accordance with those patterns[.]" *Giles v. State*, 284 Ga. App. 1, 4 (1) (642 SE2d 921) (2007). And I do not doubt that those determinations, even about matters difficult or impossible to explain to a layperson, such as the difference between guilty and innocent nervousness, are often sound. But in order to protect

2

what the Fourth Amendment calls upon us to protect, we must limit our analysis to what can be explained in words.