**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**September 20, 2024**

# In the Court of Appeals of Georgia

A24A0862. SHUMATE v. THE STATE.

DILLARD, Presiding Judge.

In this appeal following the grant of an interlocutory application, Keith Shumate challenges the trial court's denial of his motion to suppress. Specifically, Shumate argues the trial court erred by finding that law enforcement was authorized to (1) arrest him for giving a false name during a voluntary encounter and, alternatively, (2) detain him to conduct a K-9 free air drug sniff of his car. Because we agree with Shumate on the latter point, we reverse.

When considering the denial of a motion to suppress, we view the evidence "in favor of the court's ruling, and we review de novo the trial court's application of the

law to undisputed facts."[1] So viewed, the record shows that—at approximately 2:30 a.m. on November 30, 2020—two Polk County Police Department officers were on routine patrol with their K-9 Unit when they decided to stop at a convenience store for a drink and make "consensual encounters" with patrons. When the officers arrived, they noticed a small passenger car in the parking lot with two occupants and fogged windows, which they found suspicious because it could indicate the car had been parked for a while. As a result, they decided to approach the vehicle.[2]

The officers approached the driver and passenger sides of the car, respectively. No lights or sirens were activated on their patrol car at the time, and they did not draw their weapons. The officer who approached the driver's side, Sergeant Smith, tapped on the window. Shumate opened the door and explained that he was working on the car's broken door, the handle of which was in his hand.

---

[1] *Creamer v. State*, 337 Ga. App. 394, 395 (788 SE2d 69) (2016) (punctuation omitted).

[2] One of the officers also testified that—as they began to walk into the gas station—he noticed the vehicle's passenger "was eating [ ] pecan logs" and "began to inhale them in a way that is not normal for a human to do[,] almost like it is a nervous eating[,] [l]ike she was trying to ingulf [sic] them." The officer found this behavior "odd" because "[a] normal person does not eat that way." So, that too "led [the officers] to go over there and speak to them."

A conversation then ensued, during which Smith inquired as to Shumate and the passenger's itinerary. Shumate claimed they were coming from the passenger's mother's home in Alabama right before Smith asked him for his driver's license. Shumate produced a driver's license and handed it to Smith, who believed the person pictured on the license was not Shumate. Even so, Smith confirmed the driver's license was valid with no outstanding warrants before he continued speaking with Shumate. Although the encounter began as a voluntary one, Smith testified that once he recognized Shumate was not the person pictured in the driver's license, Shumate was no longer free to leave or ignore his requests—though he did not say this to Shumate. Indeed, Smith testified that he "wanted [Shumate] to believe that it was still just a consensual encounter, so as not to raise any alarms."

But as Smith was checking the driver's license, the other officer on the scene—Officer Mitchell—was standing by the passenger's side of the vehicle. And just after Smith finished checking Shumate's purported license (but before it could be returned), Mitchell noticed through the rear-passenger window that Shumate was holding a screwdriver, at which point Mitchell ordered Shumate to put the screwdriver down. Smith then ordered Shumate to exit the vehicle. After he did so,

Shumate was placed in handcuffs for officer safety and led to the side of the convenience store. The officers then took separate statements from Shumate and the passenger before comparing the information they were given.

According to Smith, this type of separate questioning is a tactic he and Mitchell use in criminal and drug interdiction; and if Shumate and the passenger gave the same story, Smith would have "just address[ed] the false name and date of birth." But while Shumate again told Smith the pair were returning from the passenger's mother's house in Alabama, the passenger—Jacquline Washington—told Mitchell they were returning from her mother's home in Fulton County. According to Mitchell, most of his questions to Washington came *after* she was removed from the vehicle because the front-passenger window had been covered with tape. The officers subsequently asked for consent to search the vehicle, and Shumate declined the request.[3]

---

[3] Although the trial court concluded—before they asked for consent to search—that Smith told Mitchell about and showed him the driver's license Shumate produced (and Mitchell agreed the person photographed was not Shumate), the record does not establish *when* this actually happened. Indeed, Mitchell testified only that he was shown the license "[l]ater on after the fact."

Without consent to search, Smith decided to conduct a K-9 free-air search due to the conflicting statements about the itinerary, the time of night, concern for officer safety, and the production of a driver's license that did not depict Shumate. The K-9 alerted to the front passenger tire-well of the car, after which an interior search of the vehicle was conducted. That search produced a small amount of methamphetamine in the center console and THC cartridges in the glove box. A second K-9 alert to the passenger tire-well led Smith to believe there were more drugs in the vehicle; and so he removed the glove box, which led to the discovery of a plastic bag containing methamphetamine (located behind the passenger tire-well). Following these discoveries, Smith spoke with Shumate again, informing him of what the officers recovered and confronting him about the driver's license. Shumate then provided his real name and date of birth before both he and Washington were arrested.

Shumate was subsequently indicted on charges of trafficking methamphetamine, possessing methamphetamine with the intent to distribute, possession of methamphetamine, possession of tools for the commission of a crime, and giving false information to a law-enforcement officer. Shumate filed a motion to

suppress those statements and evidence, but the trial court denied it after a hearing. This appeal by Shumate follows our grant of an application for interlocutory appeal.[4]

1. First, Shumate argues the officers were not authorized to arrest him for the offense of giving a false name during a voluntary, first-tier encounter because they were not engaged in "official duties" at that time. We disagree with Shumate's assertion that the officers were not engaged in "official duties" during the first-tier encounter.[5]

The Supreme Court of the United States has construed the Fourth Amendment to the United States Constitution[6] as setting forth three tiers of police-citizen

---

[4] While Washington joined in Shumate's motion to suppress below, she is not a party to this appeal.

[5] Although Shumate argues the trial court erred in determining the officers "were authorized to arrest [him] for giving a false name during a voluntary police encounter," the focus of his argument is on whether officers are engaged in "official duties" during a first-tier encounter. The trial court concluded that the officers *were* engaged in official duties and thus they were authorized to further *detain* Shumate for investigation.

[6] U.S. CONST. amend IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); *see also* GA. CONST. Art. 1, Sec. 1, Par. XIII ("The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause supported by oath or affirmation particularly describing the place or places to

encounters: "(1) communication between police and citizens involving no coercion or detention, (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause."[7]

During a first-tier encounter, an officer "may approach citizens, ask for identification, ask for consent to search, and otherwise freely question the citizen without any basis or belief of criminal activity so long as the police do not detain the citizen or convey the message that the citizen may not leave."[8] And it is well settled that a citizen's ability to "walk away from or otherwise avoid a police officer is the touchstone of a first-tier encounter."[9]

During a second-tier encounter, an officer may "stop persons and detain them briefly, when the officer has a particularized and objective basis for suspecting the

be searched and the person or things to be seized.").

[7] *Ewumi v. State*, 315 Ga. App. 656, 658 (1) (727 SE2d 257) (2012) (punctuation omitted); *accord State v. Copeland*, 310 Ga. 345, 351 (2) (b) (850 SE2d 736 (2020).

[8] *In the Interest of D. H.*, 285 Ga. 51, 53 (2) (673 SE2d 191) (2009) (punctuation omitted); *accord Ewumi*, 315 Ga. App. at 658 (1).

[9] *Ewumi*, 315 Ga. App. at 658 (1) (punctuation omitted); *see Copeland*, 310 Ga. at 354 (2) (c) (ii) ("If [the citizen] assumed a 'defensive stance' while the deputies were engaged only in a first-tier encounter, such behavior would be consistent with his right to decline any contact from the police at that point in the encounter.").

persons are involved in criminal activity,"[10] which means "more than a subjective, unparticularized suspicion or hunch."[11] The officer's actions during a second-tier encounter must be "justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion,"[12] and there must be "some basis from which the court can determine that the detention was neither arbitrary nor harassing."[13]

And relevant here, under OCGA § 16-10-25, "[a] person who gives a false name, address, or date of birth to a law enforcement officer in the lawful discharge of

---

[10] *Ewumi*, 315 Ga. App. at 658 (1) (punctuation omitted); *see Copeland*, 310 Ga. at 351-52 (2) (b) ("In a 'second-tier' encounter, when an officer develops a reasonable, articulable suspicion that the citizen is committing or has committed a crime, the officer then has the authority to detain the citizen for an investigative stop.").

[11] *Ewumi*, 315 Ga. App. at 658 (1) (punctuation omitted).

[12] *Ewumi*, 315 Ga. App. at 658-59 (1) (punctuation omitted); *see Copeland*, 210 Ga. at 352 (2) (b) (noting that second-tier investigative stops, or detentions, must be supported by reasonable, articulable suspicion of criminal activity); *State v. Walker*, 295 Ga. 888, 890 (764 SE2d 804) (2014) ("[I]t is a seizure of a person that must be supported by articulable suspicion. . . . [A] command from a law enforcement officer, alone, is not sufficient to constitute a seizure for purposes of the Fourth Amendment. Rather, under the Fourth Amendment, a seizure occurs only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.") (punctuation omitted)).

[13] *Ewumi*, 315 Ga. App. at 659 (1) (punctuation omitted).

his official duties with the intent of misleading the officer as to his identity or birthdate is guilty of a misdemeanor."[14] This case, then, involves the analytical interplay between this statute and the applicable type of Fourth Amendment encounter.

So, whether an officer is "acting in the lawful discharge of his official duties often turns on the type of encounter between the officer and a citizen."[15] And importantly, during a second-tier encounter, "an officer is not within the lawful discharge of his official duties within the meaning of [the statute] when he approaches and questions an individual without specific articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct."[16] But here, Shumate incorrectly

---

[14] *See Horton v. State*, 350 Ga. App. 133, 135 (1) (828 SE2d 150) (2019) (explaining that the lawful discharge of an officer's duties was an essential element of the crime that the State must prove beyond a reasonable doubt).

[15] *Dougherty v. State*, 341 Ga. App. 120, 123 (799 SE2d 257) (2017).

[16] *Harper v. State*, 285 Ga. App. 261, 263 (1) (a) (645 SE2d 741) (2007); *see Overand v. State*, 240 Ga. App. 682, 683 (1) (523 SE2d 610) (1999) ("[I]f police lack an articulable suspicion, their detention and questioning of a witness or suspect do not constitute official duties and, though obstructed, are insufficient for an obstruction conviction."); *cf. Sexton-Johnson v. State*, 354 Ga. App. 646, 650 (1) (a) (839 SE2d 713) (2020) ("During the course of this second-tier encounter, [the officer] . . . was authorized to request identification from the occupants, and when the back-seat passenger gave false information about her identity, the officer had probable cause to arrest her."); *Stanley v. State*, 213 Ga. App. 95, 96-97 (443 SE2d 633) (1994) (holding evidence was sufficient to support trial court's conclusion that police had probable

interprets our prior cases as suggesting a *first-tier* encounter *never* falls within an officer's official duties. And in doing so, Shumate heavily relies on *Holt v. State*,[17] which involved a second-tier, investigatory detention of a vehicle's passenger unsupported by reasonable, articulable facts giving rise to reasonable suspicion of criminal conduct, and thus was not a *lawful* discharge of official duties.[18] Even so, Shumate fixates on a single sentence in *Holt,* in which we noted that when "circumstances do not provide an officer with articulable suspicion (less than probable cause, but greater than mere caprice) that the law has been or is about to be violated, the officer's act of detaining and questioning an individual is nothing more than a police-citizen encounter outside the scope [of] the officer's 'official' police duties."[19]

cause to arrest the defendant for giving a false name when there was "evidence that prior to his arrest, the defendant provided the police officers with two different names in response to their requests that he identity himself" during questioning, and defendant was stopped when officers had reasonable, articulable suspicion that he was engaged in the criminal activity of possessing cocaine and marijuana).

[17] 227 Ga. App. 46 (487 SE2d 629) (1997).

[18] *See id.* at 50 ("Because [the officer] could not articulate a particularized reason for questioning defendant . . . and because the [officer] admitted he had no basis for believing that defendant had engaged in, was engaging in, or was about to engage in criminal activity, [the officer] was not lawfully discharging his 'official duties' when he questioned defendant.").

[19] *Id.* at 48; *accord Wynn v. State*, 236 Ga. App. 98, 99 (2) (511 SE2d 201) (1999).

But this sentence must be read and construed in the context of the *entire* opinion, which unquestionably holds that the relevant officer was engaged in an investigatory detention—*i.e.*, a second-tier encounter—without reasonable, articulable suspicion of criminal activity.[20] Indeed, the sentence in question even uses the word "detaining," indicating that the *Holt* Court was still referring to the unlawful execution of such an encounter. So, to the extent this isolated sentence in *Holt*—or any cases relying upon *Holt*—could possibly be read as suggesting that first-tier encounters *never* involve the discharge of official duties, such an interpretation is entirely unfounded, and we flatly reject it.[21]

---

[20] Even Judge Smith's dissent in *Holt* characterizes the encounter as a second-tier investigatory detention. *See Holt*, 227 Ga. App. at 55 ("Under these circumstances, the officer was certainly justified in his suspicion that the occupants of the vehicle were 'scoping out' the parked cars, and he was in the lawful discharge of his official duties in questioning [the defendant] in order to determine his identity or to maintain the status quo momentarily while obtaining more information." (punctuation omitted)).

[21] *See In the Interest of G. M. W.*, 355 Ga. App. 151, 155 (1) (a)-(b) (842 SE2d 920) (2020) (explaining that after juvenile provided officers with a false name and date of birth during an initial voluntary, first-tier encounter, when they then approached him a second time, "they had an objective and particularized basis for suspecting that the misdemeanor crime of giving false information had occurred," and thus they were "authorized to detain [him] to investigate the matter further").

Our reading of *Holt* is also consistent with our subsequent decision in *Galindo-Eriza v. State*[22] (which Shumate *also* heavily relies on in his brief), in which we concluded that, although officers *were* engaged in official duties in effectuating a first-tier knock-and-talk encounter, the defendant's permissible act of fleeing from the house during a first-tier encounter did not obstruct or hinder those duties.[23] Accordingly, the officers in *Galindo-Eriza* did not have probable cause to arrest the defendant for obstruction.[24]

A correct reading and understanding of the foregoing caselaw, then, shows that an officer's lawful official duties during a voluntary first-tier encounter *include* asking a person for identification.[25] But because a first-tier encounter is entirely voluntary,

---

[22] 306 Ga. App. 19 (701 SE2d 516) (2010).

[23] *See id.* at 24 (1).

[24] *See id.*; *see also Thomas v. State*, 322 Ga. App. 734, 738-39 (2) (b) (746 SE2d 216) (2013) ("The officer here did have a particularized and objective basis for suspecting [the defendant] of criminal activity. Had he commanded [the defendant] to stop, the encounter would have been elevated to the second tier. But as there was no evidence of a command, we must conclude that the encounter was a first-tier encounter and therefore that [the defendant] did not knowingly obstruct the officer" by walking and then running away after officer asked to speak with him "for a second.").

[25] *See In the Interest of D. H.*, 285 Ga. at 53 (2) (explaining that during a first-tier encounter, "police may approach citizens, ask for identification, ask for consent to

a person who is asked for identification is always free to ignore the officer's request,[26]

refuse the request,[27] or even run away from the officer.[28] That person may *not*,

search, and otherwise freely question the citizen without any basis or belief of criminal activity so long as the police do not detain the citizen or convey the message that the citizen may not leave" (punctuation omitted)); *Ewumi*, 315 Ga. App. at 658 (1) (same).

[26] *See Copeland*, 310 Ga. at 351 (2) (b) ("Importantly, an officer may not use force to effectuate a first-tier encounter as an officer in such an encounter has no authority to detain or restrict the liberty of a citizen, and the citizen has the right to withdraw from the encounter or resist any such use of force with a proportionate use of force."); *Ewumi*, 315 Ga. App. at 658 (1) (explaining that, during a first-tier encounter, "an individual may refuse to answer or ignore the request and go on his way if he chooses, for this does not amount to any type of restraint" (punctuation omitted)).

[27] *See Wagner v. State*, 206 Ga. App. 180, 182 (424 SE2d 861) (1992) ("As the only evidence of antisocial conduct by appellant prior to arrest is his refusal to give his name, the jury had to conclude this was why he was arrested. But a mere refusal to identify oneself to a police officer is not a crime.").

[28] *See Galindo-Eriza*, 306 Ga. App. at 25 (1) ("The officers . . . had no probable cause to arrest the house's occupants for obstruction by flight when their flight was from a first-tier encounter that they had every right to terminate."); *State v. Dukes*, 279 Ga. App. 247, 251 (630 SE2d 847) (2006) ("[Because] [the defendant] had the right to leave the encounter, his exercise of that right, even if accomplished by running, cannot constitute obstruction. That is to say, even though the officers were lawfully discharging their official duties at the time [the defendant] fled, those official duties during the first-tier encounter did not include detaining [the defendant] or preventing him from leaving. Consequently, by exercising his right to leave the first-tier encounter, [the defendant] did not, as a matter of law or fact, hinder or obstruct the officers' lawful discharge of their duties.").

however, choose to respond to such a request by providing false information with the intent to deceive the officer.[29]

Here, the officers who approached Shumate's car testified that during their initial approach, and up until Mitchell spotted the screwdriver, Shumate and Washington were free to leave. In other words, it was a voluntary, first-tier encounter, and Shumate could have declined or even completely ignored Smith's request to see his driver's license.[30] But again, it is not permissible to respond to such an encounter

---

[29] *See In the Interest of G. M. W.*, 355 Ga. App. at 155 (1) (a)-(b) (explaining that after juvenile provided officers with a false name and date of birth during an initial voluntary, first-tier encounter, when they then approached him a second time, "they had an objective and particularized basis for suspecting that the misdemeanor crime of giving false information had occurred," and thus they were "authorized to detain [him] to investigate the matter further," after which point the juvenile essentially "confessed to the crime by providing his correct name and date of birth, giving the officers probable cause to arrest him").

[30] *See, e.g.*, *Black v. State*, 281 Ga. App. 40, 44 (1) (635 SE2d 568) (2006) ("[T]he police did not activate their blue lights when they pulled into the gas station, did not tell [the defendant] to stop, nor take any action indicating that he was being detained. To the contrary, the police simply approached him behind the gas station and asked if they could 'talk to him for a second,' none of which indicated [the defendant] was not free to leave. Thus, [the defendant] was completely free to exercise his right to ignore the police and to leave."). Although Shumate includes a *footnote* asserting that he "disagrees" with the trial court's conclusion that the initial approach by the officers was a voluntary, first-tier encounter, he does not challenge that finding on appeal. And as we have repeatedly explained, it is "inappropriate for this Court to speculate as to possible bases for reversal that might be lurking in the

14

by providing a false name, address, or date of birth with the intent of misleading an officer who is lawfully engaged in the discharge of his official duties—*e.g.*, asking for identification during a voluntary, first-tier encounter.[31] So, when Smith recognized the person in the driver's license photograph was *not* Shumate, Smith then had an objective, particularized basis for further investigating why Shumate handed him what appeared to be another person's driver's license.[32] Accordingly, Shumate's assertion that the trial court erred in finding that the officers were engaged in "official duties" during the first-tier encounter lacks merit.

---

record but are not clearly articulated in the brief and supported by argument and citation to authority." *Collins v. Newman*, 237 Ga. App. 861, 861-62 (1) (517 SE2d 100) (1999); *accord Smyrna Dev. Co. v. Whitener Ltd. P'ship*, 280 Ga. App. 788, 790 (2) n.3 (635 SE2d 173) (2006) (punctuation omitted).

[31] *See* OCGA § 16-10-25 ("A person who gives a false name, address, or date of birth to a law enforcement officer in the lawful discharge of his official duties with the intent of misleading the officer as to his identity or birthdate is guilty of a misdemeanor.").

[32] *See In the Interest of G. M. W.*, 355 Ga. App. at 155 (1) (a)-(b) (explaining that after juvenile provided officers with a false name and date of birth during an initial voluntary, first-tier encounter, when they then approached him a second time, "they had an objective and particularized basis for suspecting that the misdemeanor crime of giving false information had occurred," and thus they were "authorized to detain [him] to investigate the matter further").

2. Next, Shumate argues the officers unlawfully detained him to conduct a drug investigation, asserting that they lacked reasonable, articulable suspicion to warrant such a detention. In the alternative, he argues the officers unlawfully prolonged the detention. We agree with Shumate that the officers unlawfully prolonged his detention without reasonable, articulable suspicion of criminal activity when they immediately abandoned the investigation into the driver's license issue.

As detailed *supra*, there are three tiers of police-citizen encounters, and Shumate maintains the officers unlawfully engaged in a second-tier encounter by removing him from his vehicle, handcuffing him, detaining him, and using a K-9 to conduct a free-air search of his vehicle. There are, of course, several factors to consider in determining whether (and when) an officer's words or conduct amount to a second-tier seizure, including the following: "(1) whether there were several officers present, creating a threatening atmosphere; (2) whether any weapon was displayed; (3) whether any physical touching occurred; or (4) whether any language or tone of voice indicated that the defendant was compelled to comply with the officer's request."[33]

---

[33] *State v. Richards*, 327 Ga. App. 58, 61 (1) (755 SE2d 367) (2014).

In this case, Smith ordered Shumate to exit the vehicle after Mitchell saw a screwdriver in his hand and told Shumate to put it down—which he immediately did. As a result, Shumate was subjected to a second-tier encounter at that point, after which he was handcuffed and moved to the side of the building.[34] The question, then, is whether the officers had reasonable, articulable suspicion of criminal activity so as to warrant the detention. The trial court concluded they did based on (1) the vehicle occupants' conflicting statements, (2) the time of night, (3) concern for officer safety, and (4) the production of a driver's license that did not belong to Shumate. And based on our holding in Division 1, *supra*, we agree the officers had reasonable, articulable suspicion to detain Shumate for further investigation into his act of handing Smith a

[34] *See Durden v. State*, 320 Ga. App. 218, 220 (1) (739 SE2d 676) (2013) (explaining that "even if the officer's initial interaction with [defendant] could be characterized as a first-tier encounter, it escalated into a second-tier stop when the officer ordered [defendant] to remove his hands from his pockets"); *Durrance v. State*, 319 Ga. App. 866, 869 (1) (c) (738 SE2d 692) (2013) (explaining that defendant was subjected to a second-tier encounter when he was "asked to exit the vehicle, keep his hands visible, and allow himself to be patted down for weapons after he identified himself as a suspect in [a] domestic violence investigation"); *Santos v. State*, 306 Ga. App. 772, 774 (1) (703 SE2d 140) (2010) ("Examples of circumstances that might indicate a second-tier detention include . . . the use of language or tone of voice indicating compliance with the officer's request might be compelled." (punctuation omitted)); *Peters v. State*, 242 Ga. App. 816, 817 (1) (531 SE2d 386) (2000) (concluding there was a second-tier encounter when "officers verbally commanded [defendant] to stop and prevented him from entering his automobile").

driver's license that appeared to belong to someone else;[35] but that is not what the officers proceeded to investigate after removing Shumate from the car.

According to Smith, at the time Shumate and Washington were detained, he and Mitchell were "investigating [Shumate] for false name and date of birth" but *also* believed there was "more going on" aside from the provision of a different person's identification. Smith testified that he believed Shumate and Washington were trafficking narcotics based on his "knowledge, training and experience" in light of the following: providing a false identification; traveling in a vehicle from another county at 2:30 a.m.; Shumate and Washington's conflicting stories; and some of Washington's body language. But it is undisputed that Smith never investigated the false-name incident until *after* the K-9 drug sniff.

The record shows Smith never asked Shumate for his name, date of birth, or social-security number prior to asking for consent to search the vehicle during the detention. He also did not ask Washington to identify Shumate or inquire as to why

[35] *See In the Interest of G. M. W.*, 355 Ga. App. at 155 (1) (a)-(b) (explaining that after juvenile provided officers with a false name and date of birth during an initial voluntary, first-tier encounter, when they then approached him a second time, "they had an objective and particularized basis for suspecting that the misdemeanor crime of giving false information had occurred," and thus they were "authorized to detain [him] to investigate the matter further").

18

Shumate provided the wrong identification. Instead, at the point Washington was removed from the vehicle and handcuffed, the investigation had already turned into a drug investigation. Indeed, Smith testified that, contrary to his earlier statement, he was no longer investigating the false-identification issue at the time Shumate was removed from the vehicle, because he grabbed the screwdriver and "no reasonable person is going to try to harm a police officer over a fake ID or giving . . . the wrong ID." So, the question is whether there was reasonable, articulable suspicion to detain and question Shumate for a reason *other* than the provision of another person's license.

> Smith testified as follows about Shumate's removal from the vehicle:
>
> Smith: . . . I'm more concerned at that point about what else is going on besides him handing me an ID that's not his. Is the female [(Washington)] in the front seat, is she potentially kidnapped? Is she being trafficked? We don't know.
>
> Counsel: Well, she was speaking to Officer Mitchell, wasn't she?
>
> Smith: Yeah. But there are numerous cases throughout America of people who have been trafficked and they cooperate with law enforcement, and don't say nothing [sic] about somebody taking them.

Counsel: Yes, that's true. And did Officer Mitchell convey to you any concern that Ms. Washington was being trafficked?

Smith: I didn't speak to Officer Mitchell until your client was already detained.

Counsel: There you go. So is there any indication that you had that Ms. Washington was being trafficked?

Smith: *No, but there was also no — I have no indication that there was drugs in the car either. I said there were indicators to me that there was something more serious going on than just a fake ID.*[36]

Counsel: Something else is going on and you're not really sure what?

Smith: Correct.

As for Mitchell, he testified that he believed something "suspicious" was going on with Shumate and Washington based on "where they were located, the time of night they were there, conflicting statements, [and] the screwdriver incident." And similar to Smith, regarding the point at which Shumate was detained, Mitchell testified as follows regarding the purpose of the detention:

---

[36] (Emphasis supplied).

20

Mitchell: For reasonable articulable suspicion.

Counsel: Okay. And what did you suspect they had done?

Mitchell: Criminal activity.

Counsel: Any criminal activity?

Mitchell: Any possible criminal activity.

Counsel: So in your mind, you were there to see if they had committed any crime that's in the books?

Mitchell: No ma'am. So the time of night that it was. Two people sitting in a high crime area, and there is a screwdriver that he begins to tuck underneath his leg while the other officer is there gives us obviously some concern for criminal activity. That's not normal behavior for someone to go get a drink at SmartMart.

Turning now to the remaining factors the trial court found as the officers' bases for reasonable, articulable suspicion of criminal activity, the conflicting statements that were given by Shumate and Washington do not support the detention that began when Shumate was removed from the vehicle because Smith did not learn about the conflicting statements until *after* Shumate was detained. Indeed, Shumate was

removed from the car, handcuffed, and then taken to the side of the convenience store, after which Smith assisted Mitchell in getting Washington out of the vehicle and detained. It was only then that Smith learned about the conflicting stories. As a result, the trial court's finding that Shumate was detained because of the conflicting statements is *not* supported by the record because his detention began before those statements were compared.[37]

Next, in terms of concern for officer safety, the record shows that Smith could not see the screwdriver at any point in which Shumate had it in his hand because it is undisputed that Shumate did not raise the screwdriver in a threatening manner. Mitchell testified that nothing unusual drew his attention to the screwdriver, just that he noticed that it was "tucked beside [Shumate's] right leg, with the handle in his hand, and the tip pointed down like it would be in an icepick-stabbing-type motion, but he had it at his right leg."[38] At the time he saw the screwdriver, Mitchell was not

---

[37] *See Bodiford v. State*, 328 Ga. App. 258, 267 (2) (761 SE2d 818) (2014) (explaining that "the free air sniff occurred as a result of [officer's] decision to expand the traffic stop beyond its original purpose and it therefore cannot serve as a basis for [defendant's] continued detention").

[38] Although the dissent maintains the facts show Shumate was "concealing" the screwdriver, the trial court described the situation as Mitchell having "noticed Defendant Shumate had a screwdriver in his hand." And while we view the facts in

aware that Shumate had told Smith he was parked at the convenience store to work

on the broken driver's side door handle, but he believed Shumate was trying to tuck

the screwdriver under his leg to hide it from Smith. Mitchell only told Smith about its

positioning after the fact, when Shumate was already out of the car and detained. So,

the trial court's finding that Shumate was detained for officer safety is supported by

facts, however slight they may be.

The only other factor the trial court found to support the detention was the time

of night that Shumate and Washington were in the parking lot—2:30 a.m.[39] Thus,

while the officers were warranted in removing Shumate from the car out of concerns

---

the light most favorable to the trial court's ruling, "an appellate court generally must limit its consideration of the disputed facts to those expressly found by the trial court." *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015); *see Miller v. State*, 288 Ga. 286, 287 (1) (702 SE2d 888) (2010) ("[W]e must focus on the facts found by the trial court *in its order*, as the trial court sits as the trier of fact."); *infra* note 39.

[39] While the officers gave other reasons (*i.e.*, the vehicle being from another county, the area being one of high crime, Washington's unusual manner of eating pecan logs), none of them were included in the trial court's findings. And as a reviewing court, we may not "supplement the trial court's findings with additional findings of our own that rely on testimony that inherently presented questions of credibility and were not 'indisputably discernible' from [a] video of the stop." *State v. Ortiz*, 363 Ga. App. 829, 829 (873 SE2d 217) (2022) (punctuation omitted); *see Hughes*, 296 Ga. at 746 (1) (explaining that "an appellate court generally must limit its consideration of the disputed facts to those expressly found by the trial court").

for officer safety (despite that he was holding a screwdriver after telling Smith he was stopped to fix his broken door handle), they were *not* justified in detaining him to investigate anything *other* than the provision of another person's identification. There were no reasonable, articulable facts, as found by the trial court, to support an expansion of the investigation beyond the driver's license—which was abandoned before it ever began.[40]

---

[40] *See Taylor v. State*, 342 Ga. App. 814, 816 (805 SE2d 131) (2017) ("Articulable suspicion requires a particularized and objective basis for suspecting that a citizen is involved in criminal activity. Although this suspicion need not meet the higher standard of probable cause, it must be more than a mere caprice or a hunch."); *cf. Rush v. State*, 368 Ga. App. 827, 833 (2) (890 SE2d 883) (2023) (holding that free-air sniff by K-9 did not unreasonably prolong the initial detention because "the free-air sniff occurred within five minutes of the initial stop with a K-9 who was already present on the scene and *while the officers were still awaiting results from the check on [the driver's] license*" (emphasis supplied)); *Jackson v. State*, 335 Ga. App. 630, 633 (782 SE2d 691) (2016) (explaining that the defendant's "inconsistent answers as to why he was in Georgia, his inability to recall the location where he had been, his statement that he was exiting the interstate to get gas despite that he had plenty of gas and that gas was cheaper in his home state of Alabama, and the fact that he had passed the only gas station at the exit when he was stopped, considered in totality, provided reasonable articulable suspicion sufficient to allow [the officer] to broaden his investigation beyond a simple traffic offense"); *Mordica v. State*, 319 Ga. App. 149, 153 (1) (a) (736 SE2d 153) (2012) (explaining that "[a]lthough extreme nervousness alone does not constitute a valid reason for detention based on suspicion of criminal activity, such behavior combined with the strong scent of air freshener and [defendant's] strange explanation regarding the reason for his trip constituted evidence on which the trial court could conclude that under the totality of the circumstances, [the officer] had a reasonable, articulable suspicion of criminal activity justifying a brief

Although the dissent suggests we should apply the "right for any reason" doctrine to affirm the trial court's denial of the motion to suppress on the basis that the officers had probable cause to arrest Shumate after he gave Smith another person's driver's license, this ground was not argued below—as the dissent acknowledges. The State, of course, has "the burden of proving that the search and seizure were lawful."[41] But because it was not raised by the State below, Shumate had no opportunity to respond to this argument, the argument was not placed before the trial court, and it was not briefed on appeal. It is well established that we cannot affirm as "right for any reason" on the basis of a reason that was not raised below.[42] Suffice it

---

detention"); *Davidson v. State*, 257 Ga. App. 260, 264 (1) (570 SE2d 698) (2002) (holding that officer was justified in detaining defendant for further investigation after observing "driver's nervousness and strange behavior" and having "a strange encounter with [the defendant] over the insurance card," which led to some questioning that did not unreasonably prolong the detention).

[41] *Lowe v. State*, 295 Ga. 623, 626 (2) (759 SE2d 841) (2014).

[42] *Jordan v. Kimpton Hotel & Rest. Grp., LLC*, 368 Ga. App. 750, 762 (2) (890 SE2d 417) (2023), *cert. denied*; *see State v. Domenge-Delhoyo*, 338 Ga. App. 439, 447–48 (2) (790 SE2d 139) (2016) ("The dissent asserts that we should affirm the trial court's grant of the motion to suppress in this case on an alternative ground . . . But this ground was not argued in the motion to suppress hearing, not ruled upon by the trial court, and not addressed by the parties in their briefs on appeal. While we recognize that this court can affirm the grant of a motion to suppress if it is right for any reason raised below, the ground relied upon by the dissent does not support the trial court's

to say, it is not our responsibility as an appellate court to make arguments for the State that the State never asserted in the trial court.[43]

Accordingly, because the officers lacked reasonable, articulable suspicion of a crime other than the provision of a false identification (which they did not investigate), the trial court abused its discretion by denying Shumate's motion to suppress the evidence collected as a result of his detention.

For all these reasons, we reverse.

*Judgment reversed. Brown, J., concurs. Padgett, J., dissents.*

---

grant of a motion to suppress here." (citations & footnotes omitted)).

[43] *Lowe v. State*, 352 Ga. App. 458, 463 (835 SE2d 301) (2019).

A24A0862. SHUMATE v. THE STATE.

PADGETT, Judge, dissenting.

The law enforcement officers involved in this case had reasonable articulable suspicion to conduct the search, and ultimate seizure, that occurred in this case. The majority found that the encounter between the officers and Shumate escalated into a second-tier encounter. However, I believe that the encounter is more properly viewed as a third-tier encounter under these unique facts. Even if the interaction only amounted to a second-tier encounter, as found by the trial court and the majority, I believe the resulting use of the trained canine was authorized under law under the totality of the circumstances. Therefore, I must respectfully dissent.

I fully concur with the majority's analysis and conclusion that the initial interaction between the law enforcement officers and Shumate constituted a first-tier encounter in the context of the Fourth Amendment. "[E]ven when officers have no

basis for suspecting a particular individual, they may generally ask questions; and ask to examine the individual's identification,;—as long as the police do not convey a message that compliance with their requests is required." *Quinn v. State*, 268 Ga. 70, 72 (485 SE2d 483) (1997) (cleaned up). The initial interaction between Sergeant Smith, Officer Mitchell, and the occupants of the vehicle did not implicate the Fourth Amendment. *State v. Walker*, 350 Ga. App. 168, 174-175 (2) (a) (828 SE2d 402) (2019). However, the interaction between Shumate and the officers justifiably escalated.

Smith asked Shumate where he and his female passenger were coming from before they stopped in Polk County at 2:30 in the morning. Shumate told Smith that he had picked up his female passenger from her mother's home in Alabama. Smith asked Shumate for his driver's license. Shumate handed Smith a valid Georgia driver's license that belonged to someone else. At that point, Smith determined that Shumate was no longer free to leave but did not communicate that subjective determination to Shumate.

After Shumate produced the wrong license , Mitchell noticed that Shumate was attempting to conceal a screwdriver from Smith's view. Mitchell ordered Shumate to put the screwdriver down, and Smith ordered Shumate out of the vehicle and placed

2

him in handcuffs. Smith sat Shumate down near the convenience store and away from the vehicle. Before Mitchell observed the screwdriver in Shumate's hand, Mitchell noticed that the female passenger appeared fidgety and was avoiding eye contact with him.

While Smith was with Shumate, Mitchell questioned the female passenger, who told him that Shumate had picked her up from her mother's home in Fulton County. The officers then conferred with one another and determined that Shumate and the passenger had given conflicting statements about where Shumate had picked up the passenger. All of these facts gave the officers reasonable articulable suspicion of criminal activity which justified continued detention. However, the facts also established probable cause for the arrest of Shumate – a conclusion with which the majority agrees.

When performing an analysis under the Fourth Amendment, we are not bound by an officer's subjective belief or opinion. "Rather, the touchstone of any Fourth Amendment analysis is a determination of whether an officer's conduct is reasonable based upon all of the objective facts." *Oglesby v. State*, 311 Ga. App. 615, 617 (716 SE2d 742) (2011) (citation and punctuation omitted). "[T]he pertinent inquiry is based upon the objective facts known to the officer at the time of the encounter, not

3

his post-hoc characterizations or opinions concerning those facts given at the suppression hearing." Id. at 618. "Because we decide whether reasonable suspicion justifies a detention based on all of the objective facts, we are not limited by the detaining officer's subjective opinions." *State v. Perry*, 349 Ga. App. 475, 478 (825 SE2d 902) (2019) (citation and punctuation omitted). See *Johnson v. State*, 299 Ga. App. 474, 478-479 (682 SE2d 601) (2009) (extensive list of Georgia and federal cases which held that the officer's subjective mindset is irrelevant to a Fourth Amendment analysis). An officer's mistaken belief that a defendant was or was not free to leave at a certain point during the officer's interaction with the defendant does not make continued detention illegal. *Cole v. State*, 254 Ga. App. 424, 426 (2) (562 SE2d 720) (2002). And we are charged with looking at the totality of the circumstances when assessing the reasonableness of an officer's conduct. *Young v. State*, 310 Ga. App. 270, 273 (712 SE2d 652) (2011).

While we owe substantial deference to the trial court's findings of fact made in connection with a motion to suppress, we conduct a de novo review of the application of the law to the facts of the case. *Perry*, 349 Ga. App. at 477. Both the trial court and the majority held that the facts supported a finding that what began as a first-tier encounter justifiably became a second-tier encounter. However, under the totality of

4

the circumstances, I believe that Shumate's detention constituted a third-tier arrest which was supported by probable cause.

"Probable cause exists when the facts and circumstances before the officer are such as would lead a reasonably discreet and prudent person to believe that a crime has been committed and that the person or property to be searched possesses or contains material which offends the law." *Lewis v. State*, 317 Ga. App. 391, 394 (730 SE2d 757) (2012) (citation and punctuation omitted). "Furthermore, probable cause is measured by examining the totality of the circumstances, and those circumstances include the inferences drawn by an officer based on his own experience." Id. at 394-395.

The majority correctly points out that Shumate's actions in providing a driver's license that did not belong to him when asked to produce his driver's license constituted a misdemeanor crime for which Shumate could have been arrested.[1]

---

[1] I note that the State never argued that the resulting search constituted a search incident to arrest or that the incident escalated into a third-tier encounter. Given that Smith testified that he did not intend to arrest Shumate for giving a false name (OCGA § 16-10-25) or unlawfully possessing, displaying or using an identification document issued to another (OCGA § 16-9-4 (b) (6)), the State may have been dissuaded from making those arguments. However, as noted above, we owe no deference to the officer's subjective intentions or characterizations.

However, even though Smith indicated that he did not intend to arrest Shumate for the false information, under the totality of the circumstances, the officers had probable cause to arrest Shumate and what began as a first-tier encounter then escalated into a third-tier encounter. See *Lopez-Lopez v. State*, 367 Ga. App. 834, 838 (888 SE2d 631 (2023) (it is the reasonable belief of an ordinary person under such circumstances, and not the subjective belief or intent of the officer, that determines whether an arrest has been effected).

In *Cromartie v. State*, officers conducted a lawful traffic stop and the defendant gave the officers a driver's license that did not belong to him. *Cromartie v. State*, 348 Ga. App. 563, 565 (1) (824 SE2d 32) (2019). Officers handcuffed the defendant and placed him in the back of a patrol car and called for a canine unit. Id. In addressing the defendant's motion to suppress, we held that by the time the drug dog arrived, the defendant was no longer in a temporary, second-tier encounter but, instead, was in a third-tier encounter, under arrest for giving false information to a law enforcement officer. Id. at 568 (2). Therefore, any delay in the arrival of the drug dog was irrelevant, and "[h]e cite[d] no authority - and we know of none - imposing the prohibition against unreasonably prolonged detentions to a lawful, third-tier arrest." Id.

Applying the rationale of the decision in *Cromartie* to the facts of this case, officers had probable cause to arrest Shumate for a violation of OCGA §§ 16-10-25 or 16-9-4 (b) (6). Officers placed Shumate in handcuffs and removed him from the vehicle. While application of handcuffs can occur in a second-tier interaction for officer safety, the facts here show that the crime(s) committed by Shumate were completed when he handed over the license depicting another individual. *Christy v. State*, 315 Ga. App. 647, 652 (2) (727 SE2d 269) (2012). It was clear to the officers that the photo that appeared on the license was not a photo of Shumate. Therefore, whether Shumate had immediately been asked for his true identity or never actually identified himself was irrelevant; the crime occurred when he handed over the license of another person and probable cause existed for his arrest at that point in time.

Whether the officers intended to actually arrest Shumate is also irrelevant as noted above; instead, the focus of the analysis should be whether probable cause existed. *Lopez-Lopez*, 367 Ga. App. at 838. Because probable cause existed to justify an arrest and Shumate was actually detained, under the Fourth Amendment tiered framework, officers had authority to arrest and perform the resulting search. "[E]ven if the trial court's asserted ground for denying a motion to suppress is erroneous, we

will affirm the ruling if it is 'right for any reason.'" *Lewis*, 317 Ga. App. at 394 (citation and punctuation omitted).

However, even if, as the trial court and majority found, the detention of Shumate only constituted a second-tier encounter, I would find that the resulting use of the canine was authorized. The majority holds that Shumate's presentation of another person's license authorized his arrest for a misdemeanor offense but characterized detention as a second-tier interaction under the Fourth Amendment.

When a law enforcement officer had validly detained an individual, the officer is

> free to have the handler walk the dog around the car, as use of a trained drug detection dog, in a location where he is entitled to be, to sniff the exterior of a container is not an unreasonable search. A drug dog's sniffing of the exterior of a car does not constitute a search under the Fourth Amendment. A police officer therefore does not need reasonable and articulable suspicion before using a canine trained in drug detection to sniff a car's exterior.

*Thomas v. State*, 289 Ga. App. 161, 162-163 (657 SE2d 247) (2008) (citation and punctuation omitted).

> The dog in the instant appeal was in a place where he was authorized to be. The container, [defendant's] car, was not being unlawfully detained.

8

> The dog did not intrude into the interior of [defendant's] car. The area around [defendant's] car is not [an] area protected by the Fourth Amendment or Par. XIII of Art. I, Sec. I of the Georgia Constitution. The owner or driver of an automobile has no reasonable expectation of privacy in the airspace surrounding his car. The use by the officer of a canine's enhanced (through training) olfactory sense [ ] cannot convert a sniff of the air around the exterior of the car into an unreasonable search of the interior of the car.

*Rogers v. State*, 253 Ga. App. 863, 864-865 (1) (560 SE2d 742) (2002). Once the trained canine alerts on the vehicle indicating the presence of illegal drugs, officers then have probable cause to search the car. *Cromartie*, 348 Ga. App. at 569 (2).

The canine that was used to perform the free air search of Shumate's vehicle was present at the scene. There was no evidence presented as to the amount of time that passed between Shumate being placed in handcuffs and the canine search; therefore, to presume that there was a lengthy delay between those two events would require mere speculation. The majority noted that Smith did not learn about the conflicting statements until "well *after* Shumate was detained."

However, my review of the record has not yielded any indication as to exactly when Smith learned of the passenger's version of events. Smith clearly did not learn about

the conflicting statements until after Shumate was detained; but Smith knew of the discrepancies prior to having the canine search the car.

The majority places emphasis on the sequence of events – that Shumate was not asked about his real identity until after the canine alerted to the vehicle. However, I believe that focus is misplaced. Shumate was lawfully detained for a legitimate reason. Given the time of day, the discrepancies in the stories by the occupants, the false identification provided by Shumate, the fact that the store was located in a high crime area, and all other facts and circumstances of the case, the officers were justified in investigating further and deploying the canine. This is true, regardless of whether they elected to immediately question Shumate as to his true identity. Again, the subjective mindset of the officers is not determinative of the application of the Fourth Amendment; even if the detention constitutes a second-tier encounter, I believe the resulting search was proper and I would affirm the trial court.